OPINION *Page 2 
{¶ 1} Plaintiff-appellant Sharon Gates appeals the decision of Columbiana County Common Pleas Court, Probate Division, that upheld the prenuptial agreement between Sharon Gates and decedent John H. Gates (referred to as John). The issue in this case is whether the probate court abused its discretion in upholding the prenuptial agreement. For the reasons expressed below, the judgment of the trial court is hereby affirmed.
 STATEMENT OF CASE {¶ 2} Sharon Gates and decedent John H. Gates were married on August 16, 1988. It was the second marriage for both of them. Sharon had no children from her first marriage. John, however, had one son, John Matthew Gates (referred to as Matthew) from his prior marriage. The union of Sharon and John produced no issue. John died intestate on June 10, 2005. At the time of John's death, Matthew was 25 years old.
 {¶ 3} Sharon and John had known each other over two years prior to their wedding. Sharon indicated that they cohabitated at John's home located on Oak Ridge Road, Yellow Creek Township, Columbiana County, Ohio, for some period of time prior to the marriage.
 {¶ 4} In July 1988, John and Sharon got a marriage license from the Columbiana County Probate Court. However, they had not set a date certain for the wedding. Sharon testified that after getting the marriage license she and John had discussed getting a prenuptial agreement. (Tr. 45). She indicated that John wanted to have her sign one because his first marriage ended in a divorce wherein John felt that he had lost everything to his first wife. (Tr. 45-46).
 {¶ 5} On August 16, 1988, John informed Sharon that they were getting married that day; it was a surprise to Sharon. (Tr. 47). Sharon indicated that John wanted to get married on that date because it was his mom and dad's anniversary. (Tr. 48). John had arranged for them to be married by the Mayor of Wellsville at 11:30 a.m. After getting married John went to work; no honeymoon was scheduled. *Page 3 
 {¶ 6} Prior to going to the mayor's office, John took Sharon to Attorney Cooper's office to sign a prenuptial agreement. (Tr. 50). They arrived at Attorney Cooper's office around 9:30 a.m. (Tr. 50). Attorney Cooper gave her a document labeled "ANTENUPTIAL AGREEMENT" to sign.[1]
Sharon testified that John told her that if she did not sign the agreement that they would not get married. (Tr. 53). She stated that she indicated that she would sign it because she loved him and she did not want a marriage like his first marriage. (Tr. 53). Sharon signed the prenuptial agreement. (Tr. 54-55).
 {¶ 7} She stated that she did look through the document, however, she did not read it closely because she cannot read very well. (Tr. 55). She indicated that her husband knew that she could not read very well. (Tr. 55). She declared that no part of the prenuptial was explained to her, and that she was not advised that she could take the document to an attorney to look it over before she signed it. (Tr. 55).
 {¶ 8} The antenuptial agreement listed John's real and personal property as: 1) Eight Acres in Yellow Creek Township; 2) 1980 Eldorado Cadillac; 3) Checking account less than $1,000; 4) Four IRA's $10,500; and 5) $14,000 in Employer plan at Jones Laughlin. The agreement listed Sharon's property as: 1) 1985 Ford Escort. The document then stated, "WHEREAS, the parties hereto have mutually agreed that neither party shall have any right, interest or claim in/or to the property of the other either during their marriage or upon the death of the other." The document further indicated that each party may freely sell or otherwise dispose of any or all of his or her own property now owned or hereafter acquired. The next clause of the document specified that each party relinquished their rights or claims as widow or widower and surviving spouse rights. The document also acknowledged that each party waived the right to administer the estate of the other party upon their death.
 {¶ 9} After signing the agreement Sharon and John proceeded to get married at the mayor's office. No family or friends were invited to witness the ceremony. After they were married for a short period of time, Sharon threw away her copy of the antenuptial agreement. *Page 4 
 {¶ 10} John died suddenly in June 2005. During the marriage, both Sharon and John were actively employed and they jointly and individually acquired assets of significant value. They acquired a restaurant and bars. The property in Yellow Creek appreciated in value due to inflation and the parties' active improvement and development. After John passed, a copy of the antenuptial agreement was found in his safe at the marital home.
 {¶ 11} On July 1, 2005, Matthew filed an Application for Authority to Administer the Estate of John. On July 29, 2005, Sharon also filed an Application for Authority to Administer the Estate of John. On October 24, 2005, Sharon filed an action for declaratory judgment to determine the validity of the prenuptial agreement; she requested that the agreement be set aside. Matthew opposed the motion. A hearing was held before the probate court on February 15, 2006 and June 28, 2006. On September 27, 2006, the probate court upheld the validity of the prenuptial agreement. Sharon timely appeals that ruling.
 STANDARD OF REVIEW {¶ 12} The probate court upheld the antenuptial agreement. All assignments of error address the validity of the antenuptial agreement. As such, the standard of review for each assignment of error is the same.
 {¶ 13} The Ohio Supreme Court has held that the validity of an antenuptial agreement is a question of fact for the trial court, and the trial court's decision will not be reversed absent an abuse of discretion. Bisker v. Bisker, 69 Ohio St.3d 608, 609-610, 1994-Ohio-307. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 218. Thus, we review the probate court's upholding of the antenuptial agreement for an abuse of discretion.
 FIRST ASSIGNMENT OF ERROR {¶ 14} "THE PROBATE COURT PREJUDICIALLY APPLIED THE WRONG STANDARD WHEN DETERMINING THE ASSETS LEFT TO SHARON L. GATES WERE NOT GROSSLY AND WHOLLY DISPROPORTIONATE TO THE TOTAL ASSETS OF THE JOHN H. GATES ESTATE." *Page 5 
 {¶ 15} It is well settled in Ohio that public policy allows the enforcement of antenuptial agreements. Gross v. Gross (1984),11 Ohio St.3d 99. An antenuptial agreement that is freely and voluntarily entered into will not be invalidated because it makes a disproportionate distribution. Fletcher v. Fletcher, 68 Ohio St.3d 464, 466,1994-Ohio-434, citing Juhasz v. Juhasz (1938), 134 Ohio St. 257, paragraph four of syllabus. "A perfect or equal division of the marital property is not required to withstand scrutiny under this standard."Gross, 11 Ohio St.3d at 109. Moreover, a strict application of the law of contracts is not appropriate, rather, the terms of the agreement and the intent of the parties at the time of execution of the agreement is of prime importance. Id. at 107.
 {¶ 16} The test in Ohio for the validity of an antenuptial or prenuptial agreement is set forth in Gross, paragraph two of the syllabus: "Such agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." Id. These conditions precedent to the enforcement of a prenuptial agreement arise in part from the fact that parties who have agreed to marry stand in a fiduciary relationship to each other. Juhasz, 134 Ohio St. 257, paragraph one of the syllabus.
 {¶ 17} Sharon acknowledges that this tripartite test is the applicable standard. However, she argues it was applied incorrectly. She contends that in determining the validity of a prenuptial agreement, the situation must be viewed as of the time the agreement was made, rather than at the time of John's death. She contends that while the probate court indicated that it was applying the Gross test in that manner, in reality, it did not. As support for that contention, she directs this court to the following statement:
 {¶ 18} "Counsel for Mrs. Gates argues that Mrs. Gates' distribution through the probate estate under the terms of the Antenuptial Agreement is unfair, unjust or disproportionate to what she would have received under the Statute of Descent and Distribution. Mrs. Gates' counsel dismisses the fact that Mrs. Gates received the majority of the value of Mr. Gates' assets and their joint earning through the total *Page 6 
estate and chooses only to focus on her inheritance under the probate estate." 09/27/06 J.E.
 {¶ 19} She argues that if the probate court had applied the correct standard, meaning it would have looked at the situation as if John died immediately following the wedding, it would have determined that the assets left to Sharon by the antenuptial agreement would be wholly and grossly disproportionate to what she would have received if there was no antenuptial agreement.
 {¶ 20} To a certain extent, Sharron is correct that, when determining the validity of a prenuptial agreement, the situation must be viewed as of the time of signing the agreement, not as of the date of divorce or in this case, death. In Gross, the Court reviewed the first two prongs of the test and looked at the date of signing. Gross,11 Ohio St.3d at 105, 108. However, when reviewing the third prong (that the prenuptial agreement did not encourage divorce or profiteering from divorce,) it looked at what occurred within the marriage. Id. at 110. For example, it stated:
 {¶ 21} "[a] hypothetical example of the type of situation which condition three seeks to avoid is whether the parties enter into an antenuptial agreement which provides a significant sum either by way of property settlement or alimony at the time of a divorce, and after the lapse of an undue short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows." Id. at 105.
 {¶ 22} In determining that this factor was not met in Gross, it stated the facts in Gross did not promote divorce or promote profiteering from divorce. It explained the man and wife had lived together for 14 years and the marriage was a harmonious one for a considerable period of time. Id. at 110.
 {¶ 23} Thus, when applying the Gross tripartite test, the first two prongs are viewed as of the date of signing, however, the third prong can take into consideration facts that occurred during the marriage. This rule of law equally applies when there is a prenuptial agreement and one spouse predeceases the other, as it does when there is a prenuptial agreement and the parties divorce. Rocker v. Rocker (1967),13 Ohio Misc. 199; In Re Moiser's Estate (Ohio Prob. 1954), 133 N.E.2d 202.
 {¶ 24} Despite Sharon's insistence, the probate court's decision and reasoning supporting that decision demonstrates that it applied the standard correctly. As to the *Page 7 
first two prongs of Gross, it did view the situation as if John's death occurred immediately following the marriage. As to the third prong, it considered what occurred during the marriage.
 {¶ 25} "Neither the property of John Gates nor the property of Sharon Gates, as disclosed in the Antenuptial Agreement, or property that may have been omitted from the Antenuptial Agreement, was professionally appraised and specific values were not set forth under the terms of the Antenuptial Agreement. The Court specifically finds, however, that both John Gates and Sharon Gates were reasonably familiar with the nature, extent and physical condition and therefore generally, the value of the other's property which was specifically identified in the Antenuptial Agreement or such other items which may have been omitted.
 {¶ 26} "* * *
 {¶ 27} "There was not an atmosphere of force, coercion, fraud, duress or overreaching by either Mr. or Mrs. Gates created by Mr. or Mrs. Gates prior to the date of the signing of the Antenuptial Agreement. Both parties voluntarily signed the Antenuptial agreement. There is no evidence of fraud or coercion by either party.
 {¶ 28} "Mrs. Gates contends that there was a lack of disclosure of the nature and extent of Mr. Gates' property. As set forth specifically in the findings above, the property that was omitted from the Antenuptial Agreement was nominal in value and was admittedly known by each of the parties to be owned by the other. Each of the parties had a reasonable degree of familiarity both with the location, character and condition of the other's property so each possessed a reasonable degree of understanding of the property's value although not specifically appraised and set forth in the agreement. There was substantial disclosure, knowledge and understanding by each party of the nature, value and extent of other party's property and what each would retain or give up by signing the agreement.
 {¶ 29} "* * *
 {¶ 30} "Under the third provision of the Gross test, the terms of Agreement do not clearly promote or encourage divorce or profiteering by divorce of either party. The actions of Mr. Gates during the marriage in arranging for transfer of the vast majority of the marital and his separate assets upon his death to Mrs. Gates through joint *Page 8 
survivorship ownership, beneficiary designation and other non-probate testamentary dispositions demonstrates a lack of intent by him to profit or become unjustly enriched by the terms of the Antenuptial Agreement upon his death."
 {¶ 31} It must be remembered that an antenuptial agreement can be wholly and grossly disproportionate as long as it is entered into voluntarily. Fletcher, 68 Ohio St.3d at 466; Juhasz, 134 Ohio St. 257;Rocker, 13 Ohio Misc. 199; In Re Moiser's Estate, 133 N.E.2d 202. As stated above, in order for the agreement to have been entered into voluntarily, it had to be entered into freely without fraud, duress, coercion, or overreaching; it has to be entered into with full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and the terms cannot promote divorce or profiteering from divorce, i.e. the Gross test. The probate court specifically found those elements. Thus, the antenuptial agreement was permitted to be disproportionate.
 {¶ 32} Furthermore, in spite of Sharon's insistence, the probate court's statement concerning the distribution of property at the time of John's death was not a reflection that the probate court did not use the right standard. Sharon fails to acknowledge the sentence that follows the probate court's complained of excerpt:
 {¶ 33} "Consideration of the impact of total distribution of Mr. and Mrs. Gates' estate under the terms of the Antenuptial Agreement viewed as of the date when the Antenuptial Agreement was executed, and also,or alternatively, as of the date of either of their deaths, does not support a finding of overreach or unfairness." (09/27/06 J.E.; Emphasis added.).
 {¶ 34} As this statement shows and an entire reading of the decision shows, the complained about probate court's indication as to how much Sharon received upon John's death was an alternative reasoning provided by the court. Although it may have been an incorrect justification for its decision, it was merely alternative reasoning. Thus, as it was not the sole basis of the decision, and as the decision was also based upon the correct standard of looking at the prenuptial agreement at the time of signing to determine whether or not it is valid, there was no error. This assignment of error lacks merit. *Page 9 
 SECOND ASSIGNMENT OF ERROR {¶ 35} "THE PROBATE COURT PREJUDICIALLY ERRED IN FINDING THAT THE PRESENTATION OF THE ANTENUPTIAL AGREEMENT TWO HOURS BEFORE THE WEDDING CEREMONY DID NOT CREATE A SITUATION OF COERCION OR OVERREACHING."
 {¶ 36} Under this assignment of error, Sharon argues that overreaching occurred. Thus, according to her, the prenuptial agreement is invalid. Her argument rests on the fact that the first time she saw the prenuptial agreement was on the day of the wedding and that she had no time to consult with an attorney.
 {¶ 37} Overreaching is part of the first prong of the Gross test for validity of prenuptial agreements. In order to be valid, the first prong indicates that the agreement must have been entered into without overreaching. Gross, 11 Ohio St.3d 99. The burden of proving fraud, duress, coercion or overreaching remains with the party challenging the agreement. Fletcher, 68 Ohio St.3d 464. Overreaching is defined as one party outwitting or cheating the other "by artifice or cunning, or by exploiting a significant disparity in understanding the nature of the transaction." Id. at 467.
 {¶ 38} In Fletcher, the Ohio Supreme Court did not find overreaching, but it did provide some insight into what might be considered overreaching. It explained:
 {¶ 39} "Prenuptial agreements are often drafted in such a way as to be nearly incomprehensible to a layperson. For this reason, we hold that when an antenuptial agreement provides disproportionately less than the party would have received under an equitable distribution, the party financially disadvantaged must have a meaningful opportunity to consult with counsel. The presentation of an agreement a very short time before the wedding ceremony will create a presumption of overreaching or coercion if, in contrast to this case, the postponement of the wedding would cause significant hardship, embarrassment or emotional stress."68 Ohio St.3d at 470.
 {¶ 40} Thus, for overreaching, there are two considerations. The first is whether there was a meaningful opportunity to consult with counsel. The second is if the agreement was presented shortly before the ceremony, would the postponement of the wedding cause a significant hardship, embarrassment or emotional stress. *Page 10 
 {¶ 41} The Fifth Appellate District has stated that it would uphold the trial court's overreaching finding when a wife sees the prenuptial agreement two days before the wedding, tried to seek independent legal advice but was unable to get an appointment, signed the document without receiving legal advice, and the wedding was not an elaborate affair, but wife stated that postponement of the wedding would have been problematic. Postiy v. Postiy, 5th Dist. No. 2002CA00263, 2003-Ohio-2146, ¶ 28-30. The trial court in Postiy also found that there was no full disclosure of assets. The appellate court affirmed that holding and then stated while it did not need to address overreaching, it would. The appellate court found that the trial court did not abuse its discretion; there was some competent evidence to support the decision.
 {¶ 42} Likewise, in the Twelfth District, the appellate court upheld the trial court's finding of overreaching when husband made it clear that signing the agreement was a condition precedent to the marriage.Grimm v. Grimm, 12th Dist. No. CA2002-04-089, 2003-Ohio-80. Other evidence was that wife testified that she skimmed the document, had no understanding of the significance of the agreement, and "would have signed anything in order to make [appellant] happy and to ensure the marriage." Id. Evidence further indicated that wife did not have her own legal counsel and did not seek it to explain the agreement. Id. The trial court also found that there was no full disclosure of assets. Id. In upholding the trial court's decision to invalidate the antenuptial agreement, the court explained:
 {¶ 43} "This court will uphold the trial court's findings when the record contains some competent evidence to sustain the trial court's conclusions. Fletcher, 68 Ohio St.3d at 468. The trial judge was in the best position to view the witnesses, observe their demeanor, gestures, voice inflections and use these observations in weighing the credibility of the proffered testimony. Winter v. Winter (1995),102 Ohio App.3d 792, citing Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80." Id. at ¶ 16.
 {¶ 44} In Fletcher, however, the Supreme Court held that the agreement was presented on the eve of the wedding ceremony. While it acknowledged that the facts of the case lent some weight to the wife's overreaching argument, it still upheld the trial court's decision because there was some competent evidence to support the conclusion that overreaching did not occur. *Page 11 
 {¶ 45} The above shows that if there is some competent evidence to support the probate court's decision, it is not an abuse of discretion. The wedding, in this instance, was very informal. No family was present. They were married by a mayor at 11:30 a.m. and following the ceremony John went to work. Their wedding picture shows that each wore shorts and reinforces the informal nature of the wedding. While Sharon indicates it was important to John that they get married on August 16 because it was his parents anniversary, neither John's mom or any other family members, including Matthew, were present for the ceremony. All of this indicates that delaying the wedding to give Sharon the opportunity to consult an attorney about the prenuptial agreement would not have created a hardship.
 {¶ 46} Furthermore, even though the prenuptial agreement was presented to Sharon hours before the wedding, it was not a surprise to her that John wanted her to sign it. She testified that she and John had discussed, during the month prior to that (after they got the marriage license), that he wanted a prenuptial agreement signed before they got married. She also testified that she knew his reason for wanting one was because of what happened during his last marriage.
 {¶ 47} Sharon testified that she knew what a prenuptial agreement was, however, she contends that she did not know that it would apply if John predeceased her. Sharon testified that while she looked through the prenuptial agreement, she did not read it. After reviewing the prenuptial agreement, it confirms that it would apply if John predeceased her. The first page of the prenuptial agreement specifically indicates that the parties agree that neither party will have right to the property of the other "either during their marriage or upon thedeath of the other." On the second page of the prenuptial agreement, it states that "[u]pon the death of either party" all of his or her property would be distributed as if "the surviving party died during the life of the other party."
 {¶ 48} "One of the most celebrated tenets of the law of contracts is that a document should be read before being signed, and the corollary to this rule is that a party to the contract is presumed to have read what he signed and cannot defeat the contract by claiming he did not read it. See, e.g., McAdams v. McAdams (1909), 80 Ohio St. 232, 241." Hadden Co.,L.P.A. v. Del Spina, 10th Dist. No. 03AP-37, 2003- *Page 12 
Ohio-4507, ¶ 15. Thus, while she claims that she did not know the prenuptial agreement would apply in the case of death, had she read the document, she would have been aware of that.
 {¶ 49} Admittedly, Sharon indicated to the probate court that she cannot read well and that she did not understand the terms of the agreement (meaning that it would apply in the event of divorce and upon death of either spouse). However, the probate court did not believe her. It stated that it did not find her contention that she suffers from a reading disability to be credible. It referenced that she is a high school graduate who had been employed by a bank and was a manager of a food establishment prior to her execution of the agreement. Further, it added that during the marriage she solely managed a bar and a restaurant. For those reasons, it did not believe that had she read the agreement she could not have understood it.
 {¶ 50} The trial judge was in the best position to view the witnesses, observe their demeanor, gestures, voice inflections and use these observations in weighing the credibility of the proffered testimony.Seasons Coal Co., 10 Ohio St.3d at 80. Appellate courts should not generally second guess determinations of witness credibility.
 {¶ 51} That said, it is somewhat troubling to this court that Sharon was not told that she should consult an attorney prior to signing the prenuptial agreement. However, there is no strict rule that she must be instructed as such. As long as the postponement would not have caused a significant hardship, we cannot find overreaching. As explained above, the facts of this case do not indicate that there would have been any hardship in the postponement of the wedding. Furthermore, as stated above, the fact that John wanted a prenuptial agreement was not a surprise to Sharon. The couple had discussed the possibility of having a prenuptial agreement and Sharon was aware that John was adamant about having one.
 {¶ 52} Consequently, considering the trial court's decision and evidence, we cannot find that the trial court abused its discretion by finding that the first prong of Gross was met, i.e. there was no overreaching. While warning flags arise whenever a prenuptial agreement is executed hours before marriage and without independent legal advice for one of the parties, there simply is no boiler-plate requirement that such *Page 13 
circumstances mandate a conclusion that the agreement is void in each and every case. Given our standard of review and the fact that there is some competent credible evidence to support the trial court's finding, we find no merit with this assignment of error.
 THIRD ASSIGNMENT OF ERROR {¶ 53} "THE PROBATE COURT PREJUDICIALLY ERRED IN RULING THAT JOHN H. GATES MADE A FULL DISCLOSURE TO SHARON L. GATES, AND SHARON L. GATES ENTERED INTO THE ANTENUPTIAL AGREEMENT WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE NATURE, VALUE AND EXTENT OF JOHN H. GATE'S PROPERTY."
 {¶ 54} Under this assignment of error, Sharon argues that there was not full disclosure prior to signing the agreement. She contends personal property of John's that he owned at the time of the prenuptial agreement was not listed on it. Also, she contends that the prenuptial agreement did not list the value for the eight acres of property located in Yellow Creek Township, including the mortgage, the value of the retirement account or the value of the 1980 El Dorado Cadillac. She also contends that she was not provided with any documentation that the checking account really contained less than $1,000 or that the IRA's were each worth $5,000.
 {¶ 55} Matthew bears that burden to show that there was full disclosure or full knowledge of the assets. Fletcher, 68 Ohio St.3d 464, paragraph one of the syllabus; Hook v. Hook (1982), 69 Ohio St.2d 234,235. Whether there is full disclosure or knowledge is based on the totality of the circumstances. Juhasz, 134 Ohio St. at paragraph three of the syllabus. Factors to consider in determining whether there was adequate disclosure of assets include the amount of time the surviving spouse spent with decedent prior to marriage, and how familiar she was with the decedent's property, real and personal. Stewart v. Harney (Mar. 7, 1988), 12th Dist. No. CA87-80-060. In Gross, the Supreme Court indicated that the full disclosure condition could be satisfied either by an exhibit attached to the antenuptial agreement listing all assets of the parties to the agreement or alternatively a showing that there had been a full disclosure by other means. Gross, 11 Ohio St.3d at 105. *Page 14 
 {¶ 56} In 2002, the Eighth District further explained that "full disclosure" has not yet been defined by an Ohio court. Millstein v.Millstein, 8th Dist. Nos. 79617, 80185, 80188, 79754, 80186, 80963, 80184, 80187, 2002-Ohio-4783. Yet, it explained that other jurisdictions have consistently held that a spouse's general knowledge of the character and extent of the other's wealth and assets is sufficient to validate a premarital agreement. Millstein, 2002-Ohio-4783, citingAdams v. Adams (1992), 414 Pa.Super. 634, 607 A.2d 1116, 1118, quotingNigro v. Nigro (1988), 371 Pa.Super. 625, 631, 538 A.2d 910, citingIn re Estate of Geyer (1987) 516 Pa. 492, 533 A.2d 423. ("It is well settled that the disclosure need not be exact, so long as it is `full and fair,' * * * and does not `obscure the general financial resources of the parties.'"); Harbom v. Harbom (2000), 134 Md.App. 430,760 A.2d 272; Davis v. Miller (2000), 269 Kan. 732, 7 P.3d 1223; Wilson v.Moore (Tenn.App.1996), 929 S.W.2d 367; Pajak v. Pajak (1989),182 W.Va. 28, 385 S.E.2d 384; Thies v. Lowe (1995), 273 Mont. 272, 903 P.2d 186.
 {¶ 57} Millstein explained that many of the above courts have cited toLindey Separation Agreements and Antenuptial Contracts, § 90-44, as the seminal work on this topic. Millstein, 2002-Ohio-4783 at ¶ 74.Millstein quotes Lindey for the proposition:
 {¶ 58} "While the disclosure should be full, fair and open, it has been said it need not be a drastically sweeping one, and the wife need not know the husband's exact means, so long as she has a general idea of his property and resources." Id. at ¶ 75.
 {¶ 59} Millstein further explained that most courts have not construed full disclosure to require a detailed disclosure such as financial statement, appraisals or things of that nature. Id. at ¶ 76, citingWilson, 929 S.W.2d at 371. Full disclosure does not even mean that the parties need to provide an exact dollar amount if there is general knowledge of the nature and extent of the property involved.Millstein, 2002-Ohio-4783 at ¶ 77, citing Davis, 7 P.3d at 1232-1233.
 {¶ 60} The Millstein court adopted the reasoning from other jurisdictions and held that if the party challenging a prenuptial agreement has a general knowledge of the nature and extent of the other's wealth and assets that is sufficient to establish the *Page 15 
full disclosure requirement in Gross. Millstein, 2002-Ohio-4783 at ¶ 84. Accordingly, it was found that the husband's inadvertent failure to disclose one asset, which was insignificant in comparison to the husband's wealth, had no material impact on the wife's decision to sign the prenuptial agreement. Id. at ¶ 71. Furthermore, in finding that there was full disclosure, the appellate court indicated that the record demonstrated that, at the time the wife signed the agreement, she had a general knowledge of the nature and extent of Norman's wealth; she knew he was a man of exceptional means and the prenuptial agreement disclosed over $28 million in assets. She had lived and worked for him for six years prior to their marriage and further worked as an office manager of the company which managed his holdings. Id. at ¶ 84.
 {¶ 61} However, in Postiy, the Fifth District found that the trial court did not abuse its discretion by finding that there was not full disclosure. Postiy, 2003-Ohio-2146. In Postiy, husband left out $150,000 worth of assets and there were allegations that on the assets he disclosed, the amount disclosed did not reflect their actual value. The appellate court found that leaving out roughly $150,000 worth of assets out of $1,500,000 supported the trial court's conclusion. The appellate court further added that husband additionally under valued his share of a business by $300,000. Id.
 {¶ 62} In the case sub judice, the probate court acknowledged that there was property of both John and Sharon that was omitted from the prenuptial agreement. The prenuptial agreement did not list Sharon's jewelry. Also, it did not list one of John's cars, his guns or his tools. However, Sharon testified that she had knowledge of these items at the time of marriage. As such, it must be concluded that she had a general knowledge of those items and their value. Thus, the probate court correctly indicated that both parties were reasonably familiar with the nature, extent and physical condition of each other's property and therefore, generally the value of the other's property.
 {¶ 63} Furthermore, as to the property listed in the prenuptial agreement, there was also full disclosure. As stated above, courts have held that as long as there is a general knowledge of the nature and extent of the property, then there is full disclosure. Therefore, full disclosure does not require that a listing of the property, including bank accounts and values and pension accounts and values, to be attached *Page 16 
to the prenuptial agreement.[2] Hence, it cannot be concluded that there was not full disclosure of the bank accounts, IRA accounts or the pension account. Likewise, Sharon lived with John on the eight acres in Yellow Creek Township for a period prior to the marriage. As a result, the evidence supports the conclusion that she knew the value and extent of that property. Consequently, there was full disclosure for all listed property.
 {¶ 64} Thus, for all those reasons, this assignment of error is without merit. Given the evidence, we find that the trial court's determination that there was full disclosure is supported by some competent credible evidence.
 FOURTH ASSIGNMENT OF ERROR {¶ 65} "THE PROBATE COURT PREJUDICIALLY ERRED IN NOT FINDING THE ANTENUPTIAL AGREEMENT UNCONSCIONABLE."
 {¶ 66} Sharon argues that even if the prenuptial agreement was entered into voluntarily, it still should be set aside as it is unconscionable and unreasonable. This argument is based upon the Ohio Supreme Court'sGross case.
 {¶ 67} In Gross, the prenuptial agreement signed by the parties divided property and allocated spousal support in the event of divorce. The Supreme Court held that the prenuptial agreement could be enforced as to the division of property since the agreement was entered into freely. However, as to spousal support, the Supreme Court held that that provision was voidable. It explained:
 {¶ 68} "Upon the consideration of provisions relating to the division or allocation of property at the time of a divorce, the applicable standards must relate back to the time of the execution of the contract and not to the time of the divorce. As to these provisions, if it is found that the parties have freely entered into an antenuptial agreement, fixing the property rights of each, a court should not substitute its judgment and amend the contract. A perfect or equal division of the marital property is not required to withstand scrutiny under this standard. * * * *Page 17 
 {¶ 69} "In the review of provisions in antenuptial agreements regarding maintenance or sustenance alimony, a further standard of review must be applied-one of conscionability of the provisions at the time of the divorce or separation. Although we have held herein that such provisions in an antenuptial agreement generally may be considered valid, and even though it is found in a given case upon review that the agreement had met all of the good faith tests, the provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties. Accordingly, such provisions may, upon a review of all of the circumstances, be found to have become voidable at the time of the divorce or dissolution.
 {¶ 70} "* * *
 {¶ 71} "Concerning the latter point, the facts would tend to show that, although a comparatively wealthy man at the time of the execution of the antenuptial agreement, Mr. Gross became a man of considerable greater means during the years of his second marriage. Not only did his stock holdings and value thereof increase markedly, but his net income also substantially increased. The wife's standard of living has changed quite dramatically from the time of the execution of the agreement until the time of the divorce. To require the wife to return from this opulent standard of living to that which would be required within the limitations of the property and sustenance provisions of this agreement, could well occasion a hardship or be significantly difficult for the former wife.
 {¶ 72} "Under the facts here, and in light of the law pronounced in this opinion, we find the provisions for maintenance within this agreement to be unconscionable as a matter of law and voidable by Mrs. Gross. Accordingly, we hold that the provisions within this agreement for the maintenance of Mrs. Gross should be reviewed by the trial court, and alternative provisions be ordered by the court."11 Ohio St.3d at 108-111 (emphasis in original).
 {¶ 73} Gross indicates that in the prenuptial agreement context, an unconscionable standard would not apply to the review of allocation of property, but would rather apply to spousal support. Here, we are not dealing with a spousal *Page 18 
support award, instead, we are reviewing the prenuptial agreement's allocation of property. The allocation of property is reviewed solely under the Gross test. Thus, unconscionability is not the standard used to review allocation of property under the prenuptial agreement. Consequently, any argument to the contrary fails. This assignment of error lacks merit.
 {¶ 74} For the foregoing reasons, we cannot find that the trial court abused its discretion in upholding the prenuptial agreement. The judgment of the trial court is hereby affirmed.
DeGenaro, P.J., Waite, J., concurs.
[1] By definition antenuptial and prenuptial mean the same thing and can be used interchangeably. Throughout the discussion of the antenuptial agreement the parties use "prenuptial" and "antenuptial" interchangeably.
[2] While she did obtain the majority of the bank accounts (joint ownership), IRA accounts (named beneficiary) and all of John's pension by being named the beneficiary, that fact cannot be considered for full disclosure. We must look at the disclosure at the time of signing, not what happened later and what happened upon John's death. *Page 1