[Cite as *Vanderbilt v. Vanderbilt*, 2013-Ohio-1222.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

BARBARA A. VANDERBILT

    Appellee/Cross-Appellant

v.

SHANE W. VANDERBILT

    Appellant/Cross-Appellee

C.A. Nos.    11CA0103-M
              11CA0104-M


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    09 DR 0086

DECISION AND JOURNAL ENTRY

Dated: March 27, 2013

---

MOORE, Judge.

{¶1}    Barbara Vanderbilt and Shane Vanderbilt have each appealed orders of the Medina County Court of Common Pleas, Domestic Relations Division, that considered the validity of their prenuptial agreement and applied its terms for purposes of their divorce decree. With respect to Wife's appeal, the judgment of the trial court is affirmed, but with respect to Husband's appeal, the judgment of the trial court is reversed.

I.

{¶2}    The Vanderbilts married in 1999 after a long relationship. It was the second marriage for both of them, and Husband insisted that Wife sign a prenuptial agreement before they married. His insistence led Wife to end the relationship at least once, but they soon reconciled, became engaged, and planned a wedding for January 1999. Only days before the wedding, they had another disagreement about the issue. Wife met with an attorney, Husband made changes to a draft prenuptial agreement, and Wife signed it. When Wife filed a complaint

for divorce in 2009, Husband moved the trial court to determine the validity of the prenuptial agreement. After a hearing limited to that issue, the trial court ruled that the prenuptial agreement was valid but, with respect to spousal support, that the prenuptial agreement did not control.

{¶3} The trial court granted the parties a divorce on September 21, 2011, and the divorce decree resolved three issues related to the prenuptial agreement. With respect to the division of equity in the marital home, the trial court considered the evidence at trial in light of the prenuptial agreement and concluded that the percentage distribution should be based on an initial investment of separate property by Husband of $160,613.00 and "[t]he balance of the moneys expended for and on behalf of the real estate is deemed to have been equally contributed by the husband and wife." With respect to spousal support, and consistent with its earlier decision, the trial court declined to apply the terms of the prenuptial agreement and awarded Wife $3,500 per month for 49 months. Finally, the trial court concluded that $44,895.81 in home furnishings should be divided equally among the parties.

{¶4} Husband and Wife each appealed, and their appeals were consolidated for purposes of decision. Wife's five assignments of error challenge the trial court's conclusion that the prenuptial agreement is valid. Husband's seven assignments of error challenge the trial court's interpretation and application of the prenuptial agreement. We have rearranged some of the assignments of error for ease of analysis.

II.

WIFE'S ASSIGNMENTS OF ERROR

## ASSIGNMENT OF ERROR III

THE TRIAL COURT'S FINDING THAT WIFE HAD A WORKING KNOWLEDGE OF [HUSBAND'S] CAREER, BUSINESS, AND ASSETS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DISREGARDED THE REQUIREMENT THAT THERE BE A FULL FINANCIAL DISCLOSURE OF THE PARTIES' ASSETS AND UPHELD THE PRENUPTIAL AGREEMENT IN VIOLATION OF THE OHIO SUPREME COURT'S HOLDING IN GROSS V. GROSS.

{¶5} Wife's third and fourth assignments of error argue that the trial court erred in its determination that she executed the agreement with full disclosure or with full knowledge and understanding of the nature, value and extent of Husband's property. Wife's arguments focus on the trial court's evaluation of the competing evidence at trial and, therefore, maintain that the trial court's decision was against the manifest weight of the evidence. We disagree.

{¶6} When the weight of the evidence is challenged in a civil case, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Alterations in original.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶7} In Ohio, prenuptial agreements that govern the disposition of property upon divorce are valid "(1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature,

value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross v. Gross*, 11 Ohio St.3d 99 (1984), paragraph two of the syllabus. When application of a prenuptial agreement leads to a distribution "disproportionately less than the party challenging it would have received under an equitable distribution," the party asserting the validity of the agreement must demonstrate "that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent." *Fletcher v. Fletcher*, 68 Ohio St.3d 464 (1994), paragraph one of the syllabus.

{¶8} In *Gross*, the Court adopted and explained the analysis that Ohio courts had previously used when considering prenuptial agreements with respect to estate distribution. In that context, the Ohio Supreme Court had concluded that "[a]n antenuptial contract voluntarily entered into during the period of engagement is valid when the provision for the wife is fair and reasonable under all the surrounding facts and circumstances" and will be upheld even when the distribution is "wholly disproportionate" if the spouse "voluntarily enter[ed] into the contract after full disclosure or with full knowledge." *Juhasz v. Juhasz*, 134 Ohio St. 257 (1938), paragraphs two and four of the syllabus. Elaborating on this requirement, the *Juhasz* Court summarized the law applicable to prenuptial agreements:

> The rule supported by the weight of authority may be stated thus: An engagement to marry creates a confidential relation between the contracting parties and an antenuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband's property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial settlement.

*Id*. at 264.

{¶9}    In a later case, the Court explained that a "trial court, faced with an attack on [a prenuptial] agreement, must consider all facts and circumstances bearing upon the validity of that agreement, and determine whether it is binding and valid." *Hook v. Hook*, 69 Ohio St.2d 234, 236 (1982).    After concluding that the agreement at issue in that case contemplated a disproportionate distribution to the surviving spouse, the Court emphasized that "the agreement will be upheld only if it appears [the surviving spouse] voluntarily entered into the agreement with full knowledge of the nature, extent and value of her prospective husband's property." *Id*. The Court rejected any "requirement that the parties to such an agreement itemize their various assets and their worth." *Id*. at 238.

{¶10} From this context, the Ohio Supreme Court explained in *Gross* that the requirement of "full disclosure" is satisfied "either by the exhibiting of the attachment to the antenuptial agreement of a listing of the assets of the parties to the agreement, or alternatively a showing that there had been a full disclosure by other means." *Gross*, 11 Ohio St.3d at 105. Courts of appeals have consistently looked to the totality of the circumstances to determine whether the required knowledge of assets is present. *See*, *e.g.*, *Grimm v. Grimm*, 12th Dist. No. CA2002-04-089, 2003-Ohio-80, ¶ 8-9.

{¶11} In this case, the evidence at trial established that although the financial disclosures were not attached to the prenuptial agreement when Wife first consulted her attorney on December 30, 1998, they were attached when she returned to his office on the following day with the amended agreement.  Wife acknowledged that she did not know whether they were attached or not because she did not look at it before she signed it against the continuing advice of her attorney.  Although Husband acknowledged at trial that he omitted two oil and gas wells from his list of assets on the financial disclosure, the undisputed testimony demonstrated that

those assets were of insignificant value, if any. Viewing this issue in light of the totality of the testimony at trial, the trial court's conclusion that Husband made full disclosure of his assets is not against the manifest weight of the evidence. Husband's third and fourth assignments of error are overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT APPLIED A LESS STRINGENT STANDARD TO DETERMINE THE VALIDITY OF A PRENUPTIAL AGREEMENT THAN THE ONE DICTATED BY THE OHIO SUPREME COURT IN *GROSS V. GROSS*.

{¶12} Wife's second assignment of error argues that the trial court erred in its articulation of what is required to demonstrate that there has been a full disclosure of financial assets when reviewing a prenuptial agreement. Specifically, she has argued that the trial court applied a lower threshold of disclosure consistent with *Millstein v. Millstein*, 8th Dist. No. 79617, 79754, 80184, 80185, 801886, 80187, 80188, 80963, 2002-Ohio-4783, in which the Eighth District Court of Appeals concluded that a general knowledge of the spouse's wealth is sufficient to establish disclosure.

{¶13} Wife correctly observes that this Court has never had occasion to consider whether the *Millstein* analysis is valid. In light of our conclusion with respect to her third and fourth assignments of error, however, we need not reach the issue in this case. Wife's second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S FINDING THAT THE PARTIES' PRENUPTIAL AGREEMENT WAS NOT PROCURED THROUGH FRAUD, DURESS, OR OVERREACHING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE TRIAL COURT ERRED WHEN IT UPHELD THE AGREEMENT.

{¶14} In her first assignment of error, Wife has argued that the manifest weight of the evidence demonstrated that Husband obtained the prenuptial agreement through fraud, duress, and overreaching. According to Wife, Husband "subjected her to significant stress and coerced her into signing" the agreement.

{¶15} As explained above, prenuptial agreements are enforceable "(1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross*, 11 Ohio St.3d at paragraph two of the syllabus. The party challenging the agreement, however, must prove fraud, duress, coercion, or overreaching. *Id.*

{¶16} With respect to fraud, duress, coercion, or overreaching, the financially disadvantaged party "must have a meaningful opportunity to consult with counsel." *Fletcher*, 68 Ohio St.3d at 470. The critical element in this requirement is the meaningfulness of the opportunity:

> [A]ssistance of counsel may in some cases be necessary for a fully informed and considered decision to sign. The meaningfulness of the opportunity of the nonproponent party to seek counsel before executing an antenuptial agreement is, therefore, a significant element of the *Gross* test to determine whether coercion or overreaching occurred. Nevertheless, an agreement signed without counsel is not per se invalid, and mere regret at an unwise decision does not establish duress, coercion, fraud or overreaching.

*Id.* "[T]he term 'overreaching' is used in the sense of one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other." *Gross* at 105. Courts therefore look to the totality of the surrounding circumstances when considering the existence of duress, coercion, fraud, or overreaching, including knowledge of the nature of the agreement and whether the agreement was presented for signature in close

proximity to the scheduled wedding. *See Mann v. Mann*, 9th Dist. No. 09CA009685, 2010-Ohio-1489, ¶ 18-22. *See also Barth v. Barth*, 4th Dist. No. 08CA53, 2010-Ohio-425, ¶ 9-12; *Zawahiri v. Alwattar*, 10th Dist. No. 07AP-925, 2008-Ohio-3473, ¶ 22.

{¶17} Wife has argued that the prenuptial agreement in this case resulted from duress and overreaching because Husband provided the agreement to her only days before their wedding date, leaving her without a meaningful opportunity to consult her attorney and with no choice but to sign in order to proceed with the wedding. Her recitation of the events surrounding the signing of the agreement, however, does not convey the full sense of the testimony at trial.

{¶18} According to Wife, she and Husband discussed the possibility of a prenuptial agreement on two occasions before December 1998. She testified that she had always been vehemently opposed to signing and, in fact, that she and Husband had broken up over the issue in 1995. Husband also testified that Wife had always opposed a prenuptial agreement, but his testimony differed from hers in many other respects.

{¶19} According to Husband, he insisted from the beginning of their relationship that, after a difficult divorce from his first wife, he would never remarry without a prenuptial agreement. Husband testified that he and Wife broke up over the issue not once, but twice. He also testified that the matter of a prenuptial agreement was a source of continuous friction between the two of them over the course of their relationship. Numerous friends of the couple testified similarly. Husband testified that after he and Wife reconciled in 1995 and became engaged in 1997, he instructed his attorney to prepare a prenuptial agreement. Although he agreed that the draft that resulted was not the product of ongoing negotiations between him and Wife, he testified that he did give the draft to her in January 1998, leading to a second breakup. According to Husband, they reconciled when he agreed to modify the draft to include language

that would benefit Wife and her children in the event of his death. He also testified that he never wavered in his insistence on a prenuptial agreement prior to their wedding.

{¶20} Wife's attorney, Ricky Helmuth, testified that he met with Wife regarding the prenuptial agreement on December 30, 1998. According to Attorney Helmuth, he received a draft on December 28, 1998 and made notes memorializing his concerns. On December 30, he reviewed the agreement with Wife, going through the draft and providing explanations. He advised Wife not to sign the agreement, noting specifically that there were no financial disclosures included. Attorney Helmuth testified that Wife returned to his office unannounced on December 31, determined to sign the agreement. Based on Wife's representations, Attorney Helmuth assumed that the agreement had not changed, but he noted the attachment of what appeared to be financial disclosures. His advice to Wife did not change, and he "reiterated [his] recommendation" at that time. When Wife insisted on signing, Attorney Helmuth signed the certification that he had reviewed the agreement, noting that the agreement was dated on December 30.

{¶21} With respect to the timing of the agreement, the trial court credited the testimony of Husband and other witnesses that the prenuptial agreement was not sprung on Wife at the last minute but was, in fact, an ongoing source of contention between the couple. In any event, however, the Supreme Court of Ohio has noted that a prenuptial agreement may be valid, even if executed on the eve of the wedding, when "because of the small size and informality of the impending wedding, it could have been postponed had [the spouse] wished to consult counsel[.]" *Fletcher*, 68 Ohio St.3d at 468. *See also Mann*, 2010-Ohio-1489, at ¶ 20-21.

**{¶22}** Under *Fletcher*, the proximity of the agreement to the wedding date is significant because it may impede the meaningful opportunity to obtain the advice of counsel before signing:

> [W]hen an antenuptial agreement provides disproportionately less than the party would have received under an equitable distribution, the party financially disadvantaged must have a meaningful opportunity to consult with counsel. The presentation of an agreement a very short time before the wedding ceremony will create a presumption of overreaching or coercion if, in contrast to this case, the postponement of the wedding would cause significant hardship, embarrassment or emotional stress.

*Fletcher* at 470. In this case, even if we accept Wife's testimony that she was not provided a draft of the prenuptial agreement until December 28, 1998, the lateness of the hour did not interfere with her opportunity to consult an attorney. Wife went to Attorney Helmuth's office two times. He testified that he explained the agreement and his concerns on December 30 and advised her not to sign. Nonetheless, according to Attorney Helmuth, Wife returned on December 31 determined to sign over his objections. In addition, as in *Fletcher* and *Mann*, Wife and Husband planned a small wedding limited to their immediate family members, and had Wife wanted further consultations with her attorney, the circumstances of the wedding would not have exposed her to "significant hardship, embarrassment or emotional stress." *Fletcher* at 470.

**{¶23}** This Court has reviewed the entire record of the hearing on the validity of the prenuptial agreement, and we cannot conclude that the trial court lost its way in concluding that Wife did not demonstrate duress, coercion, fraud or overreaching. Wife's first assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FOUND THE PARTIES' PRENUPTIAL AGREEMENT VALID AND ENFORCEABLE WHEN THE TERMS OF THE AGREEMENT PROMOTE AND ENCOURAGE

DIVORCE OR PROFITEERING BY DIVORCE IN VIOLATION OF THE OHIO SUPREME COURT'S HOLDING *GROSS V. GROSS*.

{¶24} Wife's fifth assignment of error is that the trial court erred by determining that the agreement did not promote divorce when, according to her, it "encouraged Husband to do whatever he pleased while it discouraged Wife from leaving * * * as it financially chained her to the marriage." We disagree.

{¶25} In *Gross*, the Ohio Supreme Court provided an example of a hypothetical situation in which a prenuptial agreement might be found to encourage divorce or profiteering by divorce:

> A hypothetical example of the type of situation which condition three seeks to avoid is where the parties enter into an antenuptial agreement which provides a significant sum either by way of property settlement or alimony at the time of a divorce, and after the lapse of an undue short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows.

*Id.*, 11 Ohio St.3d at 105. In concluding that the terms of the agreement at issue did not encourage divorce or profiteering from divorce, the Court looked not only at the agreement in light of the circumstances surrounding execution, but at the duration and circumstances of the subsequent marriage. *See id.* at 109. *See also In re Estate of Gates v. Gates*, 7th Dist. No. 06 CO 60, 2007-Ohio-5040, ¶ 20-30. According to the Supreme Court, therefore, the validity of the agreement is judged, at least in part, by its fruits. Few cases have applied this analysis since *Gross* was decided. As the Ohio Supreme Court recognized in *Fletcher*, however, a prenuptial agreement that results in a distribution that is "disproportionately less than the party challenging it would have received under an equitable distribution" may still be valid. *Fletcher*, 68 Ohio St.3d 464 at paragraphs one and two of the syllabus. It stands to reason, therefore, that financial disadvantage to one spouse is insufficient in itself to establish that a prenuptial agreement encourages divorce or profiteering from divorce.

**{¶26}** According to Wife, however, the agreement is invalid precisely because it "allowed [Husband] to benefit from his divorce." Specifically, Wife has argued that the terms of the agreement permitted Husband to engage freely in infidelity without any consequences. Beyond Wife's assertions, she provides no support for the proposition that adultery during a marriage is sufficient grounds for invalidating an otherwise valid prenuptial agreement. In fact, *Gross* suggests that the opposite is true:

> The parties here, and others who enter into such instruments, specifically provide for a possible "parting of the twain" by way of divorce or separation. It would seem that some misconduct was contemplated at that time. If there would be no basic circumstance present which could occasion a separation or divorce of the parties, how could the provisions in the contemplated contract ever be meaningful as to either party? Any other view taken of such agreements would undermine and render inane the basic purpose of such agreements. If the parties had intended that the subsequent marital misconduct would extinguish the mutual promises in the agreement, either voiding the provisions or permitting only the one not at fault to enforce such provisions, the parties could very well have made this clear within the terms of the agreement.

*Gross*, 11 Ohio St.3d at 107.

**{¶27}** In this case, the terms of the agreement do not limit its applicability in the event that either spouse is unfaithful, and Wife did not demonstrate that the facts of this case require the conclusion that the agreement specifically encouraged divorce or profiteering from divorce. *See*, *e.g.*, *Johnson*, 2011-Ohio-500, at ¶ 68. Wife's fifth assignment of error is overruled.

HUSBAND'S ASSIGNMENTS OF ERROR

**<u>ASSIGNMENT OF ERROR I</u>**

IN REGARD TO THE DIVISION OF EQUITY IN THE PARTIES'[] HOME, THE COURT ERRED BY MISAPPLYING THE EVIDENCE TO ITS INTERPRETATION OF THE PARTIES' PRENUPTIAL AGREEMENT AND/OR DISREGARDING THE CLEAR AND UNAMBIGUOUS TERMS OF SAID AGREEMENT.

{¶28} Husband's first assignment of error argues that the trial court erred by disregarding the provisions of the agreement related to the marital residence and, even if the trial court's construction of the agreement is correct, that the trial court's determination that Wife contributed financially to the construction of the marital residence through referrals to Husband's business is against the manifest weight of the evidence.

{¶29}  Courts apply the law of contracts generally to the interpretation and application of valid prenuptial agreements.  *Johnson*, 2011-Ohio-500, at ¶ 10.  Consequently, our primary role in doing so is to give effect to the parties' intentions, looking first to the plain language of the prenuptial agreement:

> When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.  As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.  On the other hand, where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent.

(Internal citations omitted.)  *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11-12.  "Where the parties following negotiation make mutual promises which thereafter are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain language of the contract provides." *Aultman Hosp. Ass'n. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51 (1989), syllabus.

{¶30}  In this case, the prenuptial agreement unambiguously expressed the parties' intention that their separate incomes remain separate after their marriage.  The recitals provided, for example, that they would:

> [I]rrevocably renounce and relinquish any interest in the present property of the other or in additional property that is produced from said present property or results from passive earnings, accrued increments, interest, dividends, or the like to the extent said original and/or additional property remains separate property. The parties further intend to irrevocably renounce and relinquish any interest in after-acquired property of the other and/or any right or claim to the present or

future income or earnings of the other and any right or claim to spousal support, in the event of their separation, divorce, dissolution or other judicial termination of their marriage.

The prenuptial agreement defined separate property to include past, present, and future income, and provided that "[a]ll such separate property now owned and/or subsequently acquired by each party shall be free from the claim of the other that may arise by reason of their contemplated marriage" and that "[a]ny earnings, income, accretion, change or increase in value of such property shall be and remain the separate property of the original owner." With respect to income earned during the marriage, the agreement reiterated this intention:

All salary, earnings and other income acquired or made during the marriage shall be the sole and separate property of the party acquiring it. Each party hereby waives any property interest or right to spousal support that he or she might otherwise acquire in the earnings or income, or the proceeds, as invested or retained, thereof of the other party acquired during the marriage.

With respect to the martial residence, the agreement provided:

SHANE and BARBARA intend to use a portion of each party's respective pre-marital assets to purchase their marital residence. The parties specifically intend that their new residence shall be their joint asset, which shall continue to be maintained by marital funds. * * * To the extent that either party contributes each party's respective separate funds from the sale of a prior residence or from any other separate property to the purchase * * * the parties agree that each of them shall be entitled to the return of the same percentage of equity he or she respectively contributed, limited to: down payment, lump sum mortgage reduction * * * and the cost of any capital improvements."

{¶31} Wife agreed that she did not contribute any of her separate income from her wages or from the sale of her premarital residence toward construction of the marital home. She also agreed that she was never employed by Husband's business and that she never had separate income attributable to the business. She maintained, however, that her percentage of equity in the marital home should be higher because, according to her, Husband's separate income was higher because of her efforts in connection with his business. In other words, Wife's position is that Husband only had the separate income to contribute to construction of their home because

15

she helped to build his business. According to Wife, the couple had an unwritten agreement to the effect that she would recruit clients for his business in order to generate income for Husband that would fund the construction of the home.

{¶32} The provisions of the prenuptial agreement, however, are unambiguous. By its terms, the parties defined separate income, explained how equity in the marital residence would be calculated, and expressed the clear intention that income earned by each would remain free of claims by the other in the event of a divorce. Because the terms of the agreement with respect to the parties' separate income are clear, this Court must look no further than the agreement itself and must give effect to the parties' intentions as expressed therein. *See Aultman*, 46 Ohio St.3d 51 at syllabus. By its terms, the agreement does not contemplate any system of attributed income like the one Wife has advocated. To the extent that the trial court reached a different conclusion, we agree with Husband that it erred in its interpretation of the agreement. Even were we to accept Wife's theory of attributed income, however, there was no evidence presented at trial through which the trial court could have determined a proportion of Husband's income attributable to Wife. Apart from Wife's speculation about what might have been a reasonable proportion, there was simply no evidence in this regard.

{¶33} The trial court erred as a matter of law in its interpretation of the prenuptial agreement, and Husband's first assignment of error is sustained.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED BY IGNORING THE PRENUPTIAL AGREEMENT IN ITS DIVISION OF PERSONAL PROPERTY.

{¶34} Husband's second assignment of error is that the trial court erred in dividing the personal property consisting of household furnishings equally between the parties when the prenuptial agreement provides otherwise. We agree.

**{¶35}** As with respect to Husband's first assignment of error, the terms of the prenuptial agreement are unambiguous with respect to the division of this personal property, providing that "All household personal property bought during the marriage by marital funds or by SHANE, including, but not limited to, furniture, decorations, artwork, appliances, tools and equipment, would remain with SHANE." Wife does not dispute that the prenuptial agreement contains this language, nor does she argue that she purchased any of the personal property with her separate funds. Instead, her argument is the same as the one that she advanced with respect to Husband's first assignment of error: she is entitled to a portion of the personal property because she contributed to Husband's earning capacity during their marriage.

**{¶36}** As with Husband's first assignment of error, we agree that the terms of the agreement are unambiguous and do not contemplate Wife's theory of income. The trial court, therefore, erred in dividing the parties' property other than in accordance with the prenuptial agreement.

**{¶37}** Husband's second assignment of error is sustained.

## ASSIGNMENT OF ERROR III

THE COURT ERRED IN FAILING TO DO A CONSCIONABILITY
ANALYSIS AS TO THE ISSUE OF SPOUSAL SUPPORT.

**{¶38}** Husband's third assignment of error is that the trial court erred by disregarding the terms of the prenuptial agreement with respect to spousal support without determining that those terms were unconscionable as of the time of the divorce. We agree.

**{¶39}** Even if a prenuptial agreement is valid at the time of execution, a party may challenge the spousal support provisions contained therein by demonstrating that the terms related to spousal support are unconscionable at the time of the divorce. *Gross*, 11 Ohio St.3d at 109. In other words,

[a]lthough * * * such provisions in an antenuptial agreement generally may be considered valid, and even though it is found in a given case upon review that the agreement had met all of the good faith tests, the provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties. Accordingly, such provisions may, upon a review of all of the circumstances, be found to have become voidable at the time of the divorce or dissolution.

*Id.* The analysis of whether spousal support provisions are unconscionable is guided by the factors applicable to the determination of support under R.C. 3105.18(C)(1). *Id.* at 109-110. *See also Saari v. Saari*, 9th Dist. No. 08CA009507, 2009-Ohio-4940, ¶ 12. A trial court errs when it invalidates spousal support terms of a prenuptial agreement without conducting this conscionability analysis. *Saari* at ¶ 13-15; *Buzard v. Buzard*, 2d Dist. No. 2011 CA 18, 2012-Ohio-2658, ¶ 48-49.

{¶40} During the course of the hearing on the validity of the agreement, the trial court explained the analysis that it would employ with respect to spousal support:

[A]s a matter of law, counsel, I'm going to advise the two of you and your clients that it is well-settled law in the State of Ohio that an antenuptial agreement does not control spousal support. It may fall within one of the statutory "other factors" for the Court to consider, but an antenuptial agreement, as a matter of law, does not control spousal support be it a temporary allocation of spousal support or a final award.

Consistent with this analysis, when the trial court ordered spousal support, it noted that it had considered the factors set forth in R.C. 3105.18, but concluded that the provisions of the agreement would result in an "unfair and inequitable" result. The trial court did not find that the agreement was unconscionable with respect to spousal support but, instead, seemed to be of the view that the starting point for its analysis was that the spousal support terms of the agreement need not be enforced if they were unfair or inequitable. As the Supreme Court has recognized, however, unfair and inequitable results are often the outcome of valid prenuptial agreements.

*See Fletcher*, 68 Ohio St.3d 464 at paragraphs one and two of the syllabus (recognizing that prenuptial agreements often result in property distributions that are "disproportionately less than the party challenging it would have received under an equitable distribution.") The question for the trial court is not whether the spousal support terms of a prenuptial agreement are fair, but whether they are unconscionable when viewed at the time of the divorce. The burden of this demonstration is on the party alleging the unconscionability. *Gross* at 109-110.

**{¶41}** We therefore agree that the trial court erred by setting aside the spousal support terms in the prenuptial agreement without conducting the conscionability analysis required by *Gross*. Husband's third assignment of error is sustained.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED BY NOT ENFORCING THE PRENUPTIAL AGREEMENT PROVISION AS TO SPOUSAL SUPPORT AS IT IS NOT UNCONSCIONABLE.

### ASSIGNMENT OF ERROR V

THE COURT ERRED IN ITS DETERMINATION OF [HUSBAND'S] INCOME.

### ASSIGNMENT OF ERROR VI

THE COURT ERRED IN NOT CREDITING [HUSBAND] FOR COST PAID DURING THE PENDENCY OF THE CASE.

### ASSIGNMENT OF ERROR VII

THE COURT ERRED IN ORDERING THE ENFORCEMENT OF PARAGRAPH 4(A)(4) OF THE PRENUPTIAL AGREEMENT

**{¶42}** Husband's fourth, fifth, sixth, and seventh assignments of error challenge various aspects of the divorce decree that flowed from the trial court's decision regarding spousal support. In light of our disposition of Husband's third assignment of error, these arguments are premature. We decline to address them at this time.

IV.

{¶43} Wife's assignments of error are overruled and, with respect to C.A. No. 11CA0104-M, the judgment of the trial court is affirmed. Husband's first, second, and third assignments of error are sustained. His fourth, fifth, sixth, and seventh assignments of error are premature. With respect to C.A. No. 11CA0103-M, therefore, the judgment of the trial court is reversed, and this matter is remanded to the trial court for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant/Cross-appellee, Barbara Vanderbilt.

CARLA MOORE
FOR THE COURT

WHITMORE, P. J.
CONCURS.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶44} I concur with the majority's resolution of Barbara's assignments of error and therefore agree that with respect to C.A. No. 11CA0104-M, the judgment of the trial court should be affirmed. I also agree with the majority's resolution of Shane's third, fourth, fifth, sixth, and seventh assignments of error. I write separately, however, because I disagree with the majority's resolution of Shane's first and second assignments of error.

{¶45} The parties' prenuptial agreement provided that with respect to the marital property,

> SHANE and BARBARA intend to use a portion of each party's respective pre-marital assets to purchase their marital residence. The parties specifically intend that their new residence shall be their joint asset, which shall continue to be maintained by marital funds. "Maintained" shall refer to regular mortgage payments, routine upkeep and care. To the extent that either party contributes each party's respective separate funds from the sale of a prior residence or from any other separate property to the purchase, capital improvement and/or lump sum mortgage reduction of such residence, and in the event of the termination of the marriage, the parties agree that each of them shall be entitled to the return of the same percentage of equity he or she respectively contributed, limited to: down payment, lump sum mortgage reduction, (excluding monthly payment mortgage reduction) and the cost of any capital improvements.

The prenuptial agreement included an example of the formula that would be used to implement the provisions of the property division that also included a mortgage. When they executed the prenuptial agreement, Shane and Barbara planned to finance the purchase of the marital residence through a mortgage. Instead, they were able to build the residence debt free. The plain language of the agreement, therefore, demonstrates that the acquisition of the marital residence

falls outside the prenuptial agreement and is not subject to the formula set forth therein.  I would overrule Shane's first assignment of error on this basis.

{¶46}  Even if the property division fell within the terms of the prenuptial agreement, I would overrule Shane's first and second assignments of error because the trial court's methodology is not inconsistent with the prenuptial agreement and Barbara demonstrated that she contributed to the purchase of the marital residence.

APPEARANCES:

STEVE C. BAILEY, Attorney at Law, for Appellant.

JAMES MCILVAINE, Attorney at Law, for Appellee.