[Cite as *Menkhaus v. Menkhaus*, 2022-Ohio-2369.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CHARLES MENKHAUS, | : | APPEAL NOS. C-210219; |
| | | C-210430 |
| Plaintiff-Appellee, | : | TRIAL NO. DR-2000627 |
| vs. | : | |
| | | *O P I N I O N.* |
| NICOLE FENYO MENKHAUS, | : | |
| Defendant-Appellant. | : | |

Appeals From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed in Part and Reversed in Part and Cause Remanded

Date of Judgment Entry on Appeal: July 8, 2022

*Phyllis G. Bossin Co., L.P.A.*, and *Phyllis G. Bossin*, for Plaintiff-Appellee,

*Stagnaro Hannigan Koop, Co., LPA*, and *Michaela M. Stagnaro*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1} Asserting five assignments of error for our review, defendant-appellant Nicole Fenyo Menkhaus ("wife") brings this appeal to challenge the decree of divorce entered by the Hamilton County Court of Common Pleas, Domestic Relations Division, and the subsequent judgment of the court which granted attorney fees to plaintiff-appellee Charles Menkhaus ("husband"). For the following reasons, we overrule assignments of error one through four relating to the decree of divorce but sustain the fifth assignment of error relating to the grant of attorney fees. Accordingly, the judgment of the trial court is affirmed in part and reversed in part.

## The Parties' Prenuptial Agreement

{¶2} The dispute in this case mainly concerns a prenuptial agreement ("the agreement") entered into by the parties on August 28, 2012. In relevant part, the agreement provides the following:

RECITALS

* * *

D. Each of the parties has made a full disclosure to the other of all their assets and sources of income, the disclosure of [wife] being attached hereto marked as 'Schedule A' and the disclosure of [husband] also attached hereto marked as 'Schedule B' (the 'Disclosure Statements'). In most instances the values shown on the Disclosure Statements were determined without formal appraisal but those values were derived from information available and educated estimates made by each of them. In any event, both parties are satisfied with the values stated and if not so satisfied, have had the opportunity to have

2

independent formal appraisals made of the other's assets if they should so choose, but both are satisfied with the amounts so stated.

E. Each party wishes to preserve her/his separate estate, as such estates now exist and as they may change or be augmented in the future as hereinafter provided.

F. [Wife] and [husband] have each agreed to accept the provisions of this Agreement in lieu of all marital rights upon the death of either of them and the property now owned or hereafter acquired by either of them or in their estate.

* * *

2. SEPARATE NONMARITAL PROPERTY OF [HUSBAND]. All of the separate properties, interests and expectancies of [husband] described or referred to in Schedule B, all property acquired by [husband] in exchange for property on Schedule B, all property acquired by [husband] after the marriage with the proceeds from the sale, encumbrance or other disposition of [husband]'s property, all properties or interests in property that [husband] in the future may receive by gift, inheritance, devise, bequest, disposition in trust, or otherwise, from [wife] or any other person or source, all inurements, appreciation, investments, and reinvestments of, and all income from the same, all interests [husband] may have or come to have in any form of a retirement or benefit plan and/or pension, and all of [husband]'s salary and earnings in the future shall be and remain his separate property after the marriage as fully as if he had not married (all of the above described property and any similar interest in or rights to

property hereinafter referred to as '[husband]'s separate nonmarital property'). None of [husband]'s separate nonmarital property shall be considered community property or marital property for any reason.

\* \* \*

5. RIGHTS UPON TERMINATION OF MARRIAGE BY DIVORCE, DISSOLUTION OF MARRIAGE OR ON SUBSEQUENT ACTION FOR LEGAL SEPARATION.

(a) [Wife] and [husband] each recognize that it is impossible to presently predict the status of the law with respect to property rights and spousal support (alimony) in the future, and [wife] and [husband] therefore desire and intend hereby to define, limit, and agree upon their respective rights to temporary or *pendente lite* sustenance spousal support (alimony), permanent sustenance spousal support (alimony), lump sum spousal support (alimony), spousal support (alimony) in kind and/or division of property in the event their marriage should be terminated by a divorce or dissolution of marriage or in the event a decree of separation is entered in an action for legal separation (all or any of such proceedings being hereinafter referred to as 'termination of the marriage').

(b) In the event of termination of the marriage as the result of an action initiated or instituted by either [wife] or [husband] or by both of them jointly, then, and in any of such events, the following provisions shall be applicable:

[i] [Wife] and [husband] shall each retain as their property, free of any claims of the other, their own separate nonmarital property.

* * *

[iii] All property acquired by [husband] after the date of the marriage which is titled in his name (individually or as a tenant in common with [wife] or any other person) or held for his beneficial interest shall, to the extent of his interest, be considered as his separate nonmarital property and shall be fully retained by him, free of any claims of [wife].

* * *

(c) In the event an action for termination of the marriage is commenced by either [wife] or [husband], neither shall seek spousal support, property, or expenses from the other or seek any other relief.

* * *

12. CONSIDERATION. Both parties acknowledge that they are under no duress, pressure or undue influence. They mutually desire that this Agreement be made, realize that certain rights granted by law are being waived hereunder, and that each is fully satisfied with all the terms, provisions and conditions of this Agreement. What is stated herein encompasses all they have voluntarily agreed upon. They each consider the terms and conditions hereof to be fair, reasonable and satisfactory.

* * *

5

17. ENTIRE AGREEMENT. This Agreement contains the entire understanding between [wife] and [husband] with respect to the subject matter thereof and there are no agreements or understandings, oral or written, between [wife] and [husband] relating to the subject matter of this Agreement which are not fully expressed herein.

{¶3} Schedule B to the agreement listed a $200,000 salary as husband's source of income. Additionally, a depreciation worksheet for the business "CME Services LLC Excavation," was included within the Schedule B. The worksheet explicitly named CME as the business and listed several of CME's assets.

**Procedural History**

{¶4} Husband filed a complaint for divorce against wife on May 14, 2020, requesting that the agreement, which was attached to the complaint, be enforced. Wife answered the complaint and asserted a counterclaim for divorce. In her answer, wife admitted that the parties entered into the agreement but denied that the agreement should be enforced "in totality."

{¶5} On June 25, 2020, husband filed a motion for a protective order pursuant to Civ.R. 26(C) regarding wife's discovery requests issued on June 3, 2020. In the motion, husband asserted that wife was requesting extensive information regarding his assets and argued that such information is irrelevant and could not lead to "anything discoverable as there is no martial estate pursuant to the parties' prenuptial agreement." Husband averred that wife's requests were "nothing more than a fishing expedition in light of the parties' prenuptial agreement," and argued that it "would be burdensome, time-consuming and expensive" for husband to respond to the "irrelevant requests."

6

{¶6} Wife subsequently filed a motion to compel husband to answer the discovery requests "in full." Wife claimed in the motion that husband's business was not "listed anywhere in the prenuptial agreement because it was the parties' intent not to make the business a separate asset as the only value to the business at the time was the equipment of the business." Thus, wife asserted that only the equipment of the business was listed in the agreement as husband's separate property, and not the business itself. Wife additionally claimed that she worked at husband's business "in many different capacities" after the marriage and, through their joint efforts, the business "increased exponentially during the marriage and has significant value as of today." Accordingly, wife requested that the trial court enforce the agreement only as to the business equipment "as written" and to find that the business itself was a martial asset. Lastly, wife argued that the spousal-support provision of the agreement was "unconscionable or inequitable" because husband's income had increased "exponentially" throughout the marriage, resulting in a change of circumstances.

{¶7} On July 8, 2020, the trial court ordered that the parties exchange and file briefs on the issue of whether the agreement covered husband's business interests. Husband and wife subsequently filed written memoranda clarifying and supporting their respective positions. In a reply to husband's arguments, wife clarified that she was only seeking to invalidate the spousal-support provision of the prenuptial agreement. Regarding husband's business, wife asserted that she had "*never* argued against enforcement" of the agreement. (Emphasis sic.) She stated, "And further, Wife has never argued that she did not know about [the business.] Neither lack of disclosure nor lack of knowledge of Husband's business has ever been an issue raised by Wife." She reiterated her argument to be that Husband chose not to list the business itself as his separate property and, as a result, the business is not his separate

property under the agreement. Wife additionally attempted to "withdraw" her earlier assertion that the only value to the business at the time of the agreement was the equipment of the business and instead asserted that no one really knew why husband did not include the business itself as his separate property.

{¶8} In response, husband argued that wife's admission of full knowledge of the business at the time of the agreement was a showing sufficient to meet the full-disclosure requirement for enforcement of the agreement. Alternatively, he argued that the inclusion of the business name on the depreciation worksheet incorporated into the agreement was a sufficient disclosure. Husband further argued that inclusion of the depreciation worksheet was for the purpose of indicating the value of the business in the absence of a formal appraisal. Thus, husband asserted that there could be "no question" that the business was his separate property under the agreement. Lastly, husband asserted that wife was seeking to have the agreement "selectively" enforced to protect herself.

{¶9} After a hearing held on October 22, 2020, the trial court entered a decision on October 26, 2020, finding that husband's business interests were his separate property. The entry found that husband's affidavit of property lists three distinct LLCs: C.M.E. Services, LLC, ("CME"), CME Holdings, LLC, and CME Pipe Lining, LLC. After finding that it was conceded that only CME was in existence at the time of the marriage, the trial court concluded that the other two businesses could not be anything other than husband's separate property under paragraphs 2 and 5(b)(iii) of the agreement. The trial court went on to find that CME was also husband's separate property. The entry stated:

The only logical conclusion, giving effect to all the provisions of the Prenuptial Agreement including, but not limited to paragraphs D, E,

F of the Recitals, paragraph 2 and all the provisions of paragraph 5 in the main body of the contract, that as it reads, these parties intended to keep all their property separate unless specifically made marital by placing in both their names. Tellingly, they also agree: 'In the event an action for termination of the marriage is commenced by either [Wife] or [Husband], neither shall seek spousal support, property, or expenses from the other or seek any other relief.' This is exactly what Wife is seeking to do.

{¶10} The trial court continued to find that, under the terms of the agreement, properties or interest of husband could either be "described" or "referred to" on the attached Schedule B, and "CME Services LLC Excavation" was "referred to" in the Schedule B. Lastly, regarding wife's discovery requests, the court found, "Although the extent of husband's business interest would be discoverable as a factor to be considered in any award of spousal support, this inquiry cannot go forward until the court has an evidentiary hearing as to whether there are changed circumstances which render the provisions regarding the waiver of spouse support unconscionable." Accordingly, both husband's motion for a protective order and wife's motion to compel were "held in abeyance" until the court ruled on this issue.

{¶11} On January 25, 2021, husband filed a motion for the return of a computer and cell phone, and for a restraining order. The motion asserted that wife had a computer and cell phone in her possession that belonged to husband's business. Husband claimed that he owned CME Pipe Lining, LLC, formerly operated as CME, and that wife was issued a cell phone and laptop when she was employed by CME as an independent contractor through her own LLC, Up4Global, from approximately May 1, 2018, to November 27, 2019. The motion argued that wife refused to return

the laptop and cell phone when she left the position at CME and argued that the laptop contained proprietary business information related to CME. The motion asked the court to additionally order that wife be restrained from making any copies of the hard drive or "otherwise obtain and retain information from the computer and cell phone belonging to husband or his business" and from contacting any of CME's customers or vendors, and order that wife turn over to husband any copies she made of either device.

{¶12} Hearings were held on January 12, January 20, and February 5, 2021. The trial court entered a decision on the spousal-support issue, the discovery issue, and the computer/cell phone issue on February 22, 2021. Regarding the spousal-support issue, the trial court issued findings regarding each relevant factor under R.C. 3105.18(C)(1) and concluded, after a thorough analysis, that wife failed to meet her burden to show a change of circumstances sufficient to demonstrate that enforcement of the spousal-support provision in the agreement would be unconscionable. Accordingly, the court denied wife's motion to compel discovery and granted husband's motion for a protective order. Further, the trial court granted husband's motion and issued a restraining order prohibiting wife from copying any information contained on the computer, laptop, or external hard drive and from contacting any of CME's customers or vendors.

{¶13} The trial court entered a decree of divorce on March 2, 2021. The entry incorporated the entries from October 26, 2020, and February 22, 2021, and stated that the prenuptial agreement was enforceable in its entirety. Accordingly, the court found that there was no marital property to be divided, that spousal support was waived, and that such waiver was not unconscionable at the time of divorce.

{¶14} Husband subsequently filed a motion for attorney fees pursuant to R.C. 2323.51, asserting frivolous conduct based on the "baseless and unsupportable claims" advanced by wife. An affidavit of counsel for husband asserted attorney fees in the amount of $66,463 based on 231.40 hours worked on the case. Wife filed a response in opposition, asserting that, although not accepted by the trial court, wife's arguments were "warranted under existing law or based upon good faith arguments for an extension of existing law or the creation of new law." Wife additionally asserted that her arguments had evidentiary and legal support, although limited by the court's denial of her discovery requests.

{¶15} A hearing was held on the issue of attorney fees on August 9, 2021, and the trial court entered an order granting husband's motion for attorney fees the following day. The entry stated:

> In this case the parties had a valid, enforceable prenuptial agreement. [Wife] advanced no good faith argument for invalidation of its provisions. The only conclusion this court can reach based on the lack of viable arguments and the unwillingness to see the evidentiary documents which refuted each frivolous claim is that the litigation was advanced by [wife] solely to harass and maliciously injure [husband].

{¶16} However, the trial court found that husband would have incurred some attorney fees to obtain the divorce even without wife's "frivolous" claims. Therefore, the trial court only awarded attorney fees incurred after June 15, 2020, the date the trial court claimed it "became evident that [wife] would be pursuing her claims without compromise" and the date that husband began drafting the request for a protective order. Accordingly, the trial court ordered that wife pay husband $55,010 in attorney fees. Wife filed a motion to stay the fee award pending appeal, which the trial court

granted on September 13, 2021. Wife timely filed notices of appeal from both the decree of divorce and the subsequent judgment granting husband's motion for attorney fees.

**Hearings on Unconscionability of Spousal-Support Provision**

{¶17} Husband testified that he started CME, which was his primary source of income, in 1999. In 2016, CME's total gross receipts were $2,173,761 and the ordinary business income was $505,904. In 2017, CME's total gross receipts were $2,802,487 and the ordinary business income was $169,595. In 2018, CME's total gross receipts were $5,155,798 and the ordinary business income was $1,296,168. Husband said that he received an annual salary from CME. He distinguished his salary from the business income because he claimed that the business income was retained in the company. Husband agreed that he also paid distributions to himself on certain occasions.

{¶18} Wife testified that she had a master's degree and had worked "20-plus years of business-to-business marketing." In 2012, wife's wages were $108,510. She also had income from "some dividends and interest income," and had received "a few hundred thousand" from her father who passed away in 2012. Wife's total income for 2012 was $156,634. In 2019, wife had a net business income from self-employment of $118,067. She also had rental income from her property in Switzerland in the amount of $31,388. Thus, her total income for 2019 was $149,455.

{¶19} Wife said that she and husband had talked about his business during their marriage. In 2012, they discussed husband separating from a primary account that made up much of his business and discussed how to replace this account. Wife testified that she loaned husband $20,000 in 2013 to cover payroll at his business, which husband paid back within a short period of time. Wife also testified to several things that she did for husband's business, including: (1) creating a "unified visual

brand," which included branding templates and a company logo; (2) creating the company's first website in 2010; (3) coming up with the "d/b/a" CME Sewer Repair; (4) creating a "target list of plumbers" to work with; (5) introducing husband to SNAP, which "redesigned" the company logo; (6) teaching husband about value-based pricing; (7) completing four case studies; (8) creating a segmentation strategy; (9) recommending a customer relationship management software which was adopted and implemented at CME; (10) bringing in, engaging, and talking to vendors; (11) acting as a CME representative while engaging with Trenchless Marketing to "rebrand" the website; (12) creating the template and infrastructure and setting up monthly spreadsheets as part of a metrics tracking process; (13) creating a safety process for CME; (14) applying and implementing an entrepreneurial operating system; (15) finalizing an almost complete employee handbook; (16) creating a step-by-step process for new employees to go through; (17) having difficult conversations with employees; (18) prequalifying interviewees; (19) interacting with the company's law firm on a noncompete lawsuit; (20) arranging and participating in an interview for a magazine; and (21) running the office. Wife admitted that she was not the only one involved in these things.

{¶20} When asked if she was paid for doing these services, wife said she was paid for the things that she billed for. She claimed there were "a number of ad hoc" email responses and conversations that were unaccounted for. Wife worked as an independent contractor for CME starting in 2018. In 2019, she worked 20 hours per week for CME. She said her hours in 2018 "would have been less." Husband capped her hours at 20 hours per week. She charged husband $130 an hour for her work. She believed this was not fair compensation. When asked if she felt like she was treated fairly, wife responded:

[N]o, I don't feel that it's fair. Again, I went in to help [husband], and I went in to work on – to help him with his business and to help him with his – his health and happiness as well. The business – the business grew substantially through – through my input, whether it was direct or indirectly because [husband] would go out and do what [husband] does best. We were building this company, and we were working on this company together for our future, and I'm really – this was – this was us building together, and ultimately what's happened is [husband] has taken this future, and he's – he's eliminating me from it altogether. I'm – it's obviously – it's obviously hurtful, but it is not fair. Now, I believe people in general, regardless of who they are, should be compensated for the value that they provide and the work that they do. So – so I do not think that it's fair that I do all the effort, energy, experience, knowledge, and that I brought to the table that I brought to [husband] and that I brought to CME that he should then take this result and be able to walk away.

{¶21} Wife testified that she believed two key factors contributed to the "massive growth" of CME in 2018: (1) digital advertising, which she brought to CME, and (2) husband not "having to stay in the office and manage employee issues and manage the whole admin side of his business." She said husband "had his freedom to go out and do what he does best." She claimed that she managed the office.

{¶22} Wife was terminated from her position at CME the day before Thanksgiving in 2019. She obtained a new position in July 2020, working 30 hours per week at a salary of $50,000. She said it took eight months to find this position due

to the COVID-19 pandemic. Wife testified that her income since 2012 is "essentially the same," but said husband's income has "increased by over a million dollars."

{¶23} Husband testified that he is the sole owner of two additional businesses: CME Services and CME Pipe Lining. Both businesses are S corporations. CME Holdings is a holding company for the properties he owns. Husband's total income for 2019 was $614,624, which includes a salary from CME of $92,558. He agreed that he had general conversations about the business with wife during the marriage. He denied that wife ever improved his earning capacity. He denied that he currently laid pipe for his company and asserted that he was the president and CEO of the company and handles everything that comes with this position. He said he had been running CME for 21 years. Husband denied most of wife's claimed contributions or asserted that wife's contributions had no impact on the growth of the company. He testified that he had always employed an office manager at CME. He asserted that wife's implementation of digital marketing actually decreased the net income of the business because it was a significant expense with no return. He averred that his increased earning capacity was a result of his company doing good work and building a good reputation. He also asserted that his business had an edge because of the unique way they line the pipes. Additionally, he stated, "You know, I can tell you when and why we had big jumps, because that would be the year that I hired a salesman, and the next big jump was the year that I hired a second salesman, so that's where the big jumps are."

{¶24} Husband testified that he was already living with wife at the time of the marriage. Before he signed the prenuptial agreement, he and wife discussed that they were going to keep separate finances during the marriage. They never had a joint checking or savings account. He said that he paid rent to wife while living in her home.

He totaled the rent that he paid to wife at $174,000. He denied taking fancy vacations with wife, going out to expensive dinners, or belonging to any country clubs. He denied relying on wife's income and denied that wife ever relied on his income. He denied that they ever created a marital standard of living. He testified that he completed renovations on wife's house in the amount of $188,000, for which he was never paid.

{¶25} Wife admitted that her assets had "significantly increased" in value. She agreed that she received over $100,000 in income "without having to put clothes on." Wife testified that she and husband would split the cost 50/50 if they went on vacation. She agreed that they kept their income "completely separate" during the marriage. She denied creating a "lavish marital lifestyle."

{¶26} Matthew Benton works for Trenchless Marketing. He testified that he met husband around 2011 when he was working for Natural Media. He started Trenchless Marketing in 2014 or 2015. Husband was one of his first customers at Trenchless Marketing, after he made a proposal to husband regarding search engine optimization for his business website. Benton testified that he built CME's website. He agreed that wife was involved in some of the process for doing that. He said wife was one of three contacts at CME that Trenchless would interact with on a semi-regular basis. Wife would ask questions or make suggestions.

### Law and Analysis

#### Second Assignment of Error[1]

{¶27} In her second assignment of error, wife argues that the trial court erred as a matter of law by finding that husband's business interests were his separate

---

[1] For ease of discussion, we address the assignments of error out of order.

nonmarital property under the terms of the parties' prenuptial agreement. In *Gross v. Gross*, 11 Ohio St.3d 99, 105, 464 N.E.2d 500 (1984), the Ohio Supreme Court set forth a three-part test to determine the enforceability of prenuptial agreements (also known as antenuptial agreements): (1) the agreement must have been entered into freely without fraud, duress, coercion, or overreaching; (2) the agreement must have been entered into with full disclosure, or full knowledge, and understanding, of the nature, value, and extent of the prospective spouse's property; and (3) the agreement must not, by its terms, promote or encourage divorce or profiteering by divorce.

{¶28} "A prenuptial agreement is a contract, and generally the law of contracts applies to a court's interpretation of the agreement. But a prenuptial agreement is a 'special type of contract to which certain rules apply.' " *Gearheart v. Cooper*, 1st Dist. Hamilton Nos. C-050532 and C-060170, 2007-Ohio-25, ¶ 15, quoting *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 467, 628 N.E.2d 1343 (1993). "When a prenuptial agreement provides disproportionately less than the party challenging it would have received under an equitable distribution, the burden is on the party claiming the validity of the contract to show that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent." *Id.*, citing *Fletcher*. "The burden shifts to the party challenging the agreement to prove fraud, duress, coercion, or overreaching." *Id.*, citing *Fletcher*. "In reviewing a trial court's determination of the validity of a prenuptial agreement, an appellate court should uphold the trial court's findings if they are supported by competent evidence." *Id.* at ¶ 16, citing *Fletcher* at 468. "And an appellate court 'will indulge all reasonable presumptions consistent with the record in favor of [the trial court's] decision on questions of law.' " *Id.*, quoting *Fletcher*. " 'Courts of appeals have consistently looked to the totality of the circumstances to determine whether the required knowledge of assets is present.'

17

" *Gomer v. Gomer*, 2017-Ohio-989, 86 N.E.3d 920, ¶ 12 (6th Dist.), quoting *Vanderbilt v. Vanderbilt*, 9th Dist. Medina Nos. 11CA0103-M and 11CA0104-M, 2013-Ohio-1222, ¶ 10.

{¶29} While wife asserts that she is not seeking to invalidate the agreement, she argues that husband did not make a "full disclosure" in the prenuptial agreement because he did not specifically list the business CME Services in the agreement; however, for purposes of validity of a prenuptial agreement, full knowledge of the assets is sufficient to satisfy the disclosure requirement. *See Vanderbilt* at ¶ 7-10; *Heimann v. Heimann*, 3d Dist. Hancock No. 5-21-11, 2022-Ohio-241, ¶ 33; *Gates v. Gates*, 7th Dist. Columbiana No. 06 CO 60, 2007-Ohio-5040, ¶ 62-63. Wife does not contest that she had full knowledge of the business when the prenuptial agreement was entered into. In fact, when asked during trial what her understanding was for husband's income at the time of the agreement, she testified, "My understanding of the $200,000 stated in the prenup was that that represented the revenues of his sole proprietorship in his business."

{¶30} Therefore, the issue before this court seems to be one solely of contractual interpretation rather than invalidation of the agreement. Wife claims that CME was not expressly listed by husband in his Schedule B—only the business equipment was—and therefore, it was not intended that the business itself be included as husband's separate property under the agreement. Additionally, wife argues that CME Holdings, LLC, and CME Pipe Lining, LLC,—husband's two additional businesses formed after the marriage—could not be separate property under provision 5(b)(iii) of the agreement because it is unknown whether these businesses were purchased with money from CME.

**{¶31}** "Under Ohio law, parties to an antenuptial agreement are permitted to cut one another off entirely from any participation in the other's estate." *Roseman v. Glanz*, 8th Dist. Cuyahoga No. 93628, 2010-Ohio-680, ¶ 15, citing *Hook v. Hook*, 69 Ohio St.2d 234, 235, 431 N.E.2d 667 (1982), and *Daniels v. Daniels*, 10th Dist. Franklin No. 01AP-1146, 2002-Ohio-2767. "The law of contracts will generally apply to the application and interpretation of antenuptial agreements; such is a matter of law to be determined by the courts." *Id.*, citing *Latina v. Woodpath Dev. Co.*, 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991). "A court should interpret a contract to carry out the intent of the parties as manifested by the language of the contract." *Id.* at ¶ 16, citing *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 674 (1974), paragraph one of the syllabus.

**{¶32}** "When the terms of the contract are clear and unambiguous, courts may not create a new contract by finding intent not expressed by the terms." *Id.*, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 245-246, 374 N.E.2d 146 (1978). "In analyzing an unambiguous contact, words must be given their plain and ordinary meaning." *Id.*, citing *Forstner v. Forstner*, 68 Ohio App.3d 367, 372, 588 N.E.2d 285 (11th Dist.1990). "If a contract, or portions of a contract, are found to be ambiguous, then the courts must resort to principles of contract construction." *Id.* at ¶ 17, citing *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992). " 'All provisions of a contract must be construed together in determining the meaning and intention of any particular clause or provision therein.' " *Id.*, citing *Legler v. United States Fid. & Guar. Co.*, 88 Ohio St. 336, 103 N.E. 897 (1913). "The intention of the parties to the agreement is paramount, and contracts should be interpreted to carry out the intent insofar as it can be ascertained." *Id.*, citing

*Skivolocki* at 244, and *In re Estate of Taris*, 10th Dist. Franklin No. 04AP-1264, 2005-Ohio-1516.

**{¶33}** The key provision of the agreement pertaining to CME is provision 2, which provides that any separate properties or interests of husband described *or referred to* in the Schedule B are his separate property. Included as page three and four of the Schedule B was the depreciation worksheet for "CME Services LLC Excavation." Thus, CME is clearly "referred to" in the Schedule B. Wife argues that because the worksheet was originally created for tax purposes, there is nothing in the worksheet to indicate that the inclusion of the business name was to describe an asset to be included as separate property. However, it is unclear why this worksheet would have been included within the Schedule B if not for the purpose of identifying husband's interests in the company. Recital D of the agreement shows that the purpose of the Schedule B was to disclose husband's assets. Clearly, including the worksheet for the business within the schedule was for the purpose of referencing husband's interests in CME and thereby indicating that it was an asset which the parties intended to keep separate. This is further supported by the additional language of recital D which states that a full disclosure of assets was made, and the language of recital E which states that the parties wished to preserve each party's estate as it existed at the time of the agreement.

**{¶34}** When looking at the agreement in its entirety, it is very clear that the parties intended to keep all their assets completely separate, whether acquired before or after the marriage. Surely, given that wife was fully aware of husband's business at the time of the agreement, a specific exception for the business would have been included had that been the parties' intention. We interpret the inclusion of the depreciation worksheet for CME in accord with the clear intent of the parties at the

20

time of entering into the agreement. Accordingly, we agree with the trial court and hold that CME was included as husband's separate property under the agreement because it is referred to in the Schedule B as required under provision 2, which specifically addressed husband's separate, nonmarital property.

{¶35} Provision 2 additionally provides that all property acquired by husband in exchange for such property, as well as all property acquired by husband after the marriage with proceeds from the sale of his property, plus all income from the same, and his salary and earnings in the future, shall remain his separate property. Therefore, even if husband's two additional businesses were purchased with money from CME, they would still be included as separate property under the agreement. Accordingly, this assignment of error is overruled.

*Third Assignment of Error*

{¶36} In her third assignment of error, wife argues that the trial court erred as a matter of law by finding that wife failed to meet her burden to demonstrate the unconscionability of the spousal-support provision in the agreement. "In review of provisions in antenuptial agreements regarding *maintenance or sustenance* alimony, a further standard of review must be applied – one of conscionability of the provision at the time of the divorce or separation." *Gross*, 11 Ohio St.3d at 109, 464 N.E.2d 500. Although such provisions in prenuptial agreements may generally be considered valid and even though the agreement in question has been reviewed and found to be enforceable, "the provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties." *Id.* "Accordingly, such provisions may, upon a review of all of the circumstances, be found to have become voidable at the time of the divorce or dissolution." *Id.* This is so

21

because of the state interest in the welfare of the divorced spouse. *Id.* "It is a valid interest of the state to mitigate potential harm, hardship, or disadvantage to a spouse which would be occasioned by the breakup of the marriage, and a strict and literal interpretation of the provisions for maintenance of the spouse to be in these agreements." *Id.*

**{¶37}** The party claiming unconscionability of a provision for maintenance has the burden of showing the unconscionable effect of the provision at the time of the divorce or dissolution. *Id.* "The trial court, in the determination of the issue of conscionability and reasonableness of the provisions for sustenance or maintenance of a spouse at the time of the divorce, shall utilize the factors that govern the allowance of alimony which are set forth in R.C. 3105.18." *Id.* at 109-110.

**{¶38}** The factors to be considered under R.C. 3105.18(C) are: (a) the income of the parties, from all sources; (b) the relative earning abilities of the parties; (c) the ages and the physical, mental, and emotional conditions of the parties; (d) the retirement benefits of the parties; (e) the duration of the marriage; (f) the extent to which it would be appropriate for a party, because the party will be custodian of a minor child of the marriage, to seek employment outside the home; (g) the standard of living of the parties established during the marriage; (h) the relative extent of education of the parties; (i) the relative assets and liabilities of the parties; (j) the contribution of each party to the education, training, or earning abilities of the other party; (k) the time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought; (l) the tax consequences, for each party, of an award of spousal support; (m) the lost income production capacity of

either party that results from that party's marital responsibilities; and (n) any other factor that the court expressly finds to be relevant and equitable.

{¶39} "The question for the trial court is not whether the spousal support terms of a prenuptial agreement are fair, but whether they are unconscionable when viewed at the time of the divorce." *Vanderbilt*, 9th Dist. Medina Nos. 11CA0103-M and 11CA0104-M, 2013-Ohio-1222, at ¶ 40. Appellate "review of a trial court's decision regarding the conscionability of a spousal-support provision of an antenuptial agreement 'implicates a mixed question of law and fact.' " *Heimann v. Heimann*, 3d Dist. Hancock No. 5-21-11, 2022-Ohio-241, ¶ 53, citing *Mann v. Mann*, 9th Dist. Lorain No. 09CA009685, 2010-Ohio-1489, ¶ 10. The determination of whether the agreement is unconscionable is an issue of law which the court reviews de novo; however, a trial court's factual findings which support its determination on conscionability should be reviewed with great deference. *Mann* at ¶ 10, quoting *Saari v. Saari*, 9th Dist. Lorain No. 08CA009507, 2009-Ohio-4940, ¶ 11.

{¶40} The trial court made explicit findings regarding each relevant factor under R.C. 3105.18(C). Regarding husband's income, the trial court found that husband's income at the time of the agreement was $200,000 and that husband's business income had risen "exponentially" from the time of the marriage; however, despite the net revenue being available to him, husband only takes a "modest salary" of $96,000 a year and reinvests the remaining value in the business. *See* R.C. 3105.18(C)(1)(a). Regarding wife's income, the trial court found that she earned $100,000 in 2012 when the parties were married, and that wife had a net income of $149,455 in 2019. *See id.* Additionally, the trial court found that wife's current income, which included her salary, net rental income and investment income, was $164,000 per year, which was $64,000 more than she earned in 2012. *See id.* The

trial court found that both parties had stable earning abilities and that there was no evidence of any physical, mental, or emotional impairments. *See* R.C. 3105.18(C)(1)(b), (c). The trial court found that husband had $70,000 in retirement assets, whereas wife had $2,000,000 in retirement assets. *See* R.C. 3105.18(C)(1)(d). Regarding the martial standard of living, the trial court found that husband had paid rent and living expenses to wife and drove a company truck. *See* R.C. 3105.18(C)(1)(g). Additionally, the trial court found that the parties did not take extravagant vacations, did not belong to any country clubs, and did not go to expensive restaurants. *See id.* Further, the trial court found that each spouse paid his or her own way from their personal assets and income and that husband continued to live modestly although both parties had wealth. *See id.*

{¶41} The trial court found that husband had a high school diploma, whereas wife had advanced degrees, and that both parties had substantial assets, which increased during the marriage. *See* R.C. 3105.18(C)(1)(h) and (i). Regarding the contribution of either party to the other party's earning ability, the trial court found that (1) neither party had contributed to the education or training of the other; (2) wife contended that she increased husband's earning ability by working for his company, but this was contested by husband; (3) despite wife's lengthy testimony about what she did for the company, she provided no evidence of the effect of these efforts; (4) husband's company has had a steady income increase over the entire course of its history, with the exception of the year that wife was doing the marketing as the marketing was costly with no return, according to husband; and (5) the big jumps in income happened twice from 2012 to 2020, and both corresponded to when a new sales person was hired. *See* R.C. 3105.18(C)(1)(j).

**{¶42}** Finally, the trial court found the following additional information to be relevant to the analysis: (1) wife suggested the agreement several months prior to the marriage and it was prepared by her attorney; (2) both parties currently, and at the time of the marriage, have income which supports them, assets, and real estate; (3) husband made improvements to wife's home valued at $188,000 for which he did not charge wife and did not receive compensation; and (4) wife still owns the home which is now worth well over $550,000.

**{¶43}** These findings are supported by the record. While it seems to be undisputed that husband's assets increased substantially, this alone is insufficient for a finding of unconscionability. More than just a general change in circumstances is required. It must be a change in circumstances which renders enforcement of the spousal support provision unconscionable. *See Vanderbilt v. Vanderbilt*, 9th Dist. Medina No. 13CA0084-M, 2014-Ohio-3652, ¶ 7, 12. The purpose behind invalidating waivers of spousal support in a prenuptial agreement is to avoid harm, hardship, or disadvantage to a spouse. *See Gross*, 11 Ohio St.3d at 109, 464 N.E.2d 500. Here, the parties have always maintained separate finances, were not dependent on each other financially during the marriage, did not create a marital lifestyle together, did not own joint assets, can earn their own income consistent with the lifestyle they have been independently living, and each have substantial wealth. The fact that husband now has more assets that he did when wife suggested the agreement is not evidence of any harm, hardship, or disadvantage to wife. Her way of life and resources are not being changed in any way because of enforcement of the prenuptial agreement. Wife essentially argues that it is unfair to enforce the spousal-support provision due to husband's change in circumstance. However, valid prenuptial agreements often result in unfair circumstances. Whether enforcement is unfair is not the standard. *See*

*Vanderbilt*, 9th Dist. Medina Nos. 11CA0103-M and 11CA0104-M, 2013-Ohio-1222, at ¶ 40. The question is whether enforcement of the spousal-support provision is unconscionable. *Id.* Wife failed to meet her burden to show that enforcement of the spousal-support provision in the agreement would be unconscionable. Therefore, this assignment of error is overruled.

*First Assignment of Error*

**{¶44}** In her first assignment of error, wife argues that the trial court erred as a matter of law in granting husband's motion for a protective order and denying her motion to compel discovery responses. Civ.R. 26(B)(1) provides that, generally:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense *and proportional to the needs of the case*, considering the importance of the issues at state in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs the likely benefit.

(Emphasis added.)

> Upon motion by any party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including * * * (1) that the discovery not be had; * * * [or] (4) that certain matters not be inquired into or that the scope of discovery be limited to certain matters; * * *."

Civ.R. 26(C).

**{¶45}** We review a trial court's decision to grant a protective order under Civ.R. 26(C) for an abuse of discretion. *Ruwe v. Bd. of Twp. Trustees*, 29 Ohio St.3d 59, 61, 505 N.E.2d 957 (1987); *accord Grace v. Mastruserio*, 182 Ohio App.3d 243, 2007-Ohio-3942, 912 N.E.2d 608, ¶ 29 (1st Dist.), citing *Ruwe*. An abuse of discretion is more than an error of law or judgment; it implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. *Id.*

**{¶46}** Wife challenges the trial court's grant of husband's request for a protective order and argues that she was "hamstrung" in preparing her case, especially regarding unconscionability of spousal support. The discovery requests which husband sought to avoid are not in the record. Husband's motion for a protective order asserted that wife had issued a "wide-ranging request asking for extensive information" regarding husband's assets and asserted that it would be burdensome and time-consuming to respond given that it was an irrelevant request considering the prenuptial agreement. It should be noted that the trial court did not grant the protection order until the conclusion of all hearings related to the agreement. Additionally, at the conclusion of the first hearing on spousal support, the trial court ordered that husband turn over his tax returns for 2019 before the next court hearing once it became clear that the information was needed, and wife did not have it. The 2019 tax returns were provided to wife before the next hearing. Tax returns for the previous years had already been provided to wife. Thus, the trial court ordered the parties to turn over the information that it found to be relevant to the precise issues before it. Wife's argument seems to be focused on her entitlement to information about husband's assets as this was a relevant factor to be considered when invalidating the spousal-support provision. However, there does not seem to be any dispute that

27

husband's assets significantly increased. In fact, the trial court made a finding that husband's income had risen exponentially from the time of the marriage when considering the R.C. 3105.18(C) factors. The scope of discovery is limited to relevant information that is proportional to the needs of the case, and the trial court was within its discretion to limit discovery accordingly to protect husband from undue burden or expense. *See* Civ.R. 26(B)(1), (C). Therefore, we cannot determine the trial court abused its discretion in granting the protection order. Accordingly, this assignment of error is overruled.

*Fourth Assignment of Error*

{¶47} In her fourth assignment of error, wife argues that the trial court erred as a matter of law by granting husband's motion for return of the computer and cell phone. Specifically, wife argues that the computer and cell phone were gifts under R.C. 3105.171(A)(6)(a)(vii). Husband argues that they were purchased by CME for wife to use only and were not gifts. A trial court's factual findings as to the characterization of property is reviewed under the distinct sufficiency-and-weight-of-the-evidence standards. *Boolchand v. Boolchand*, 1st Dist. Hamilton No. C-200111, 2020-Ohio-6951, ¶ 9, citing *McKenna v. McKenna*, 1st Dist. Hamilton No. C-180475, 2019-Ohio-3807, ¶ 9-10.

{¶48} During trial, husband denied that the computer and cell phone were gifts to wife. He asserted that they were paid for by the company. Husband did agree that he bought the laptop for wife for personal and business use; however, he asserted that it was to use, not to keep. Husband testified that he did not know when the company bought wife the cell phone, but it was put on the company's account. He agreed that it was just the company information on the devices that he was concerned about. Husband said that, after wife was fired, she used a program called Keeper to

28

lock everyone at CME out of anything that required a password, and when he asked wife for the password, she told him that he had to pay her $1.4 million before she would give him the password. Wife disputed that this occurred. Husband testified that, as a result, he had to change over 214 passwords. He claimed this to be the reason why he wanted the return of the computer and cell phone as he was concerned about all of the company information on the devices and what wife would do with this information.

{¶49} At the conclusion of the spousal-support hearings, the parties discussed this issue on the record. Counsel for husband expressed that husband would be willing to allow removal of company data from the cell phone, computer, and external hard drive which wife possessed, so long as it was removed by someone experienced in information technology. Husband expressed concern that simply allowing wife to delete the files would not actually remove the data from the devices. Wife would not allow removal of the files from the devices because she claimed the templates for the documents remained hers and she did not want the templates to be shared with the company. She agreed that the company-specific data could be removed, but not the templates that she created. Counsel for husband expressed that these templates were made when she was working for the company. After further discussion between the parties, the trial court stated, "All right. You either decide or I am going to order, and nobody is going to like my order. So I suggest you make a compromise position at this point, a compromise offer right now." The parties then agreed to set up a conference call with an information technology professional to discuss this issue, and the court agreed to let the parties work it out.

{¶50} What is clear from the record is that the trial court tried to have this issue resolved between the parties. What is unclear from the record is what happened between the time that the trial court agreed to let the parties work it out by consulting

with a professional and when the trial court ordered the devices be returned to husband. Wife argues that it was an abuse of discretion for the trial court to order the return of the devices when husband agreed he just wanted the company information removed from them. However, the only inference that can be made from the record is that the parties did not reach an agreement on what information would be removed and what would not be removed from the devices in order to allow wife to keep the devices. Therefore, a property-characterization determination was required. It appears that the trial court rejected wife's assertion that the devices were gifts to her and instead ordered the return of devices to husband. We cannot determine this finding was not supported by the evidence or was against the manifest weight of the evidence. Accordingly, this assignment of error is overruled.

*Fifth Assignment of Error*

{¶51} In her fifth assignment of error, wife argues that the trial court erred as a matter of law by granting husband's motion for attorney fees. "R.C. 2323.51 allows the trial court to award fees to any party adversely affected by frivolous conduct." *Gearhart*, 1st Dist. Hamilton Nos. C-050532 and C-060170, 2007-Ohio-25, at ¶ 24, citing *Bryan v. Bryan*, 161 Ohio App.3d 454, 2005-Ohio-2739, 830 N.E.2d 1216, ¶ 7 (1st Dist.); *See* R.C. 2323.51(B)(1).

> The statute defines frivolous conduct as conduct by a party to a civil action that (1) serves merely to harass or maliciously injure another party to the action or is for another improper purpose, such as causing unnecessary delay or a needless increase in the cost of litigation; (2) is not warranted under existing law and cannot be supported by a good-faith argument for a modification or establishment of new law; (3) consists of allegations or other factual contentions that have no

evidentiary support; or (4) consists of denials or factual contentions that are not warranted by the evidence.

*Id.*, citing R.C. 2323.51(A)(2)(a).

**{¶52}** "The standard of review applicable to the imposition of sanctions for frivolous conduct under R.C. 2323.51 depends on whether there are questions of law or of fact, or whether there are mixed questions of law and fact." *Id.* at ¶ 25, citing *Riston v. Butler*, 149 Ohio App.3d 390, 2002-Ohio-2308, 777 N.E.2d 857, ¶ 25 (1st Dist.). "With respect to purely legal questions, an appellate court employs a de novo standard of review." *Id.* at ¶ 25, citing *Riston* at ¶ 27. "On the other hand, an appellate court should not disturb a trial court's findings of fact if the record contains competent, credible evidence to support the findings." (Citation omitted.) *Id.* The trial court's ultimate decision to award attorney fees based on frivolous conduct that adversely affected a party is reviewed for an abuse of discretion. *Id.*

**{¶53}** Here, the trial court based its decision to award husband attorney fees on whether a good-faith argument existed for wife to invalidate the agreement. We interpret this to be a finding that the conduct was frivolous pursuant to R.C. 2323.51(A)(2)(a)(ii), which requires conduct that is not warranted under existing law, cannot be supported by a good-faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good-faith argument for the establishment of new law. A determination under this provision involves a legal analysis that we review de novo. *Gauthier v. Gauthier*, 1st Dist. Hamilton Nos. C-170387 and C-170398, 2018-Ohio-4970, ¶ 18.

**{¶54}** R.C. 2323.51 must be applied carefully so as not to chill legitimate claims. *Id.* at ¶ 35, quoting *Hickman v. Murray*, 2d Dist. Montgomery No. CA 15030, 1996 Ohio App. LEXIS 1028, *13 (Mar. 22, 1996). The statute was designed to chill

31

egregious, overzealous, unjustifiable, and frivolous conduct; it was not intended to punish mere misjudgment or tactical error. *Id.*, quoting *Hickman.* The test for deciding whether a claim is warranted under existing law is objective and requires a determination of whether no reasonable lawyer would have brought the action in light of existing law. *Id.*, quoting *Hickman.* Said differently, a claim is frivolous only where it is absolutely clear under the existing law that no reasonable lawyer could argue the claim. *Id.*, quoting *Hickman.*

{¶55} In essence, wife advanced two arguments in the trial court for invalidating the agreement: (1) husband's businesses were not included as his separate property under the express terms of the agreement, and (2) enforcement of the spousal-support provision of the agreement would be unconscionable because wife contributed to husband's earning ability, and this resulted in a substantial increase to husband's income.

{¶56} Regarding wife's first argument pertaining to whether CME was included as husband's separate property under the agreement, the argument was based on an arguable interpretation of the agreement. As the business was mentioned solely in the depreciation worksheet included within the Schedule B, it was not a straightforward, yes-or-no, answer on whether the business was included under the language of the agreement. It required interpretation. Additionally, whether husband's other two businesses were included under the agreement hinged on whether the trial court found that CME was included under the agreement as husband's separate property. Because these issues were not straightforward under the agreement, we cannot say that no reasonable attorney would have advanced the argument.

{¶57} Regarding wife's second argument pertaining to the spousal-support provision, the argument she advanced was presented under R.C. 3105.18(C)(1)(a) and (j), which instructed the trial court to consider the parties' income and any contribution of one spouse to the earning ability of the other spouse when determining the unconscionability of enforcing a spousal-support provision. Whether wife contributed to husband's earning ability hinged on presentation of facts and credibility, and the trial court could have gone either way on this issue as it basically came down to which party was more believable. While the argument may not have ultimately prevailed, this does not make her argument frivolous. *See Pitcher v. Waldman*, 1st Dist. Hamilton No. C-160245, 2016-Ohio-5491, ¶ 21. Wife's arguments were presented based on factors that the trial court was required to consider. Accordingly, we cannot say that no reasonable attorney would have advanced this argument. Therefore, we hold that the trial court erred in finding that wife's conduct in bringing these claims was frivolous under R.C. 2323.51(A)(2)(a)(ii).

{¶58} The trial court made an additional finding under R.C. 2323.51(A)(2)(a)(i) that wife's claims were brought merely to harass husband. However, this finding was based on the trial court's previous finding that there was no good-faith basis for advancing the arguments that she did. Because we hold that this determination was in error, we also hold that the trial court's additional finding was not supported by the record. Accordingly, this assignment of error is sustained.

## Conclusion

{¶59} Having overruled the first, second, third and fourth assignments of error, we affirm the trial court's decree of divorce. Having sustained the fifth assignment of error, we reverse the trial court's judgment awarding attorney fees to

husband and remand the cause with instructions to enter judgment denying husband's motion for attorney fees.

Judgment affirmed in part and reversed in part and cause remanded.

**BERGERON** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.